620 A.2d 730

**Thomas C. and Bette C. WETTACH, Petitioners,**

**v.**

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 23, 1992.

Decided Feb. 4, 1993.

William J. Smith, for petitioners.

Ronald H. Skubecz, Sr. Deputy Atty. Gen., for respondent.

Before CRAIG, President Judge, McGINLEY, J., and NARICK, Senior Judge.

McGINLEY, Judge.

This case of first impression concerns the distinction between "business profits" and "rents" for purposes of the Pennsylvania Personal Income Tax, pursuant to Sections 303(a)(2) and (a)(4) respectively of the Tax Reform Code of 1971 (TRC).[1] Thomas C. and Bette C. Wettach (together, Taxpayers) bring this de novo petition for review from an order of the Board of Finance and Revenue (Board) that sustained the action of the Board of Appeals of the Department of Revenue (Department) approving the Department's upward adjustment of Taxpayers' 1987 income.[2]

Thomas Wettach (Thomas) is a general partner of Reed, Smith, Shaw and McClay (RSSM), a partnership engaged in the practice of law; Bette Wettach (Bette) is an artist. The parties' Stipulation of Facts establishes that in 1985, the partners of RSSM decided to acquire larger business quarters. The partners also determined that RSSM's best interest dictated ownership of the space in which the partnership conducts the law practice, and they determined to purchase the building at 435 Sixth Avenue in Pittsburgh. First, RSSM created M & M Enterprises (M & M) in 1985 for this specific purpose. A partner of RSSM participates in M & M in exactly the same way as he or she participates in RSSM—the initial share of income and losses is the same, and if their

1. Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. §§ 7303(a)(2) and (a)(4). Section 302.2(a) of the TRC, 72 P.S. § 7302.2(a), imposes a tax "on the privilege of receiving each of the classes of income hereinafter enumerated in section 303." Section 303(a) enumerates eight classes of income, also including "(1) Compensation," "(3) Net gains or income from disposition of property," "(5) Dividends," and so on.

2. Pursuant to Pa.R.A.P. 1571(f), no record shall be certified to this court from the Board of Finance and Revenue, but the parties shall take appropriate steps to prepare and file a stipulation of such facts as may be agreed to and to identify issues of fact, if any, that remain to be tried. The parties have filed a "Stipulation of Facts," Brief for Petitioners, Appendix B, which this court adopts, and no issues of fact remain.

share in RSSM changes, so does their share in M & M. Presently, a new partner admitted to RSSM also joins M & M; a partner who withdraws from RSSM either withdraws from M & M or becomes an inactive partner.

M & M is, in turn, a partner in a general partnership known as 435 Sixth Avenue Associates. 435 Sixth Avenue Associates owns the land and building at 435 Sixth Avenue, which it acquired on January 4, 1984. 435 Sixth Avenue Associates has another partner, which is also a partnership, known as L & M Associates. RSSM rents space in the building from 435 Sixth Avenue Associates. In 1987, RSSM paid rent of $327,-000.00 per month. The building contains 181,348 square feet and RSSM occupies 95% of the space.

In 1987, there was one other tenant unrelated to RSSM. Two additional tenants leased space, but their presence in the building was directly related to RSSM's occupancy; one was the building manager and the other was a company that provided service for equipment used exclusively by RSSM (the latter has since left when RSSM stopped using the equipment). Collectively, all three of these tenants occupied the remaining 5% of the available space, and they paid an aggregate of $9,310 per month in rent in 1987 (3% of the total rents collected by 435 Sixth Avenue Associates).

Under the partnership agreement with 435 Sixth Avenue Associates, M & M is entitled to 95% of the profits and losses of the building in which RSSM practices law. 435 Sixth Avenue claimed depreciation on the building, and 95% of the losses arising from that depreciation were reported on the M & M 1987 partnership information return. M & M has no interest in any property other than its partnership interest in 435 Sixth Avenue Associates, and it is a partner in no other rental partnerships. 435 Sixth Avenue Associates has no interest in real property other than the building in question. Oxford Development Company manages the building, collects the rent and pays the mortgage, taxes, insurance and all other expenses. RSSM is not involved with any rental partnerships. It deducts the rent it pays to 435 Sixth Avenue Associates from its partnership net profits for federal and state partner-

ship information tax returns. On its 1987 Federal Form 1065, "U.S. Partnership Return of Income," M & M listed its principal business activity as "Rental." On the same form 435 Sixth Avenue Associates listed its principal business activity as "Rental."

On the Taxpayers' 1987 joint Pennsylvania Individual Income Tax Return (Form PA–40) they entered $106,873.00 on Line 2, "Net Profits from Business Profession or Farm." This figure represents the $4,065 net profit from Bette's Schedule C, "Profit (or Loss) from Business or Profession (Sole Proprietorship)" and net profit of $102,808.00 from the Schedule C for Thomas. The latter is supported by two Federal Schedule K–1's, "Partner's Share of Income, Credits, Deductions, etc.," showing Thomas as a partner in RSSM and M & M. His Federal K–1 relating to RSSM lists on Line 1, "Ordinary income (loss) from trade or business activity(ies)," a profit of $165,975.94; the K–1 for M & M lists on Line 2, "Income or loss from rental real estate activity(ies)," a loss of $50,982.00, which reflects Thomas' share via M & M of the 1987 depreciation of the building by 435 Sixth Avenue Associates.

In 1989 the Department reviewed the Taxpayers' return and disallowed the loss of M & M as a setoff against the profit from RSSM. The effect of the adjustment results in a calculation of the Taxpayers' total net business profits of $155,049.00, and an increase in tax liability of $1,011.00, plus penalties and interest.

The first issue presented is whether the income or loss of M & M is properly classified as "business profits" under Section 303(a)(2) or "rents" under Section 303(a)(4) of the TRC, in view of the nature and origin of M & M's activity and the interrelationship between RSSM and M & M. Section 303(a)(2) states:

Net profits. The net income from the operation of a business, profession or other activity, after provision for all costs and expenses incurred in the conduct thereof, determined either on a cash or accrual basis in accordance with accepted accounting principles and practices but without deduction of taxes based on income.

Section 303(a)(4) states: "Net gains or income derived from or in the form of rents, royalties, patents and copyrights."

Taxpayers accurately note that the statute and regulations provide no guidance for distinguishing between "business profits" and "rents" under Section 303. Taxpayers quote from the instructions for the 1987 Form PA–40 (and acknowledge that such instructions do not have the force of statute):

> **Net Rents.** Whether your rental income or loss is reportable on line 7 [rents, royalties, patents and copyrights] or line 2 as profits from business, profession or farm depends on whether you provide your lessee significant services. Rents do not include payments for the use or occupancy of rooms or other space if significant services also are provided to the occupant.

Stipulation of Facts, Exhibit C at C–7.[3] The Taxpayers argue first that the operation of the building is the "business" of 435 Sixth Avenue Associates, which through its hired manager provides significant services: it cleans the building, provides security and twenty-four-hour access, makes repairs and performs maintenance.

The Taxpayers argue in the alternative, by analogy to cases interpreting municipal net profits taxes, that the courts essentially have discarded the "provision of services" standard and look instead to the purpose for and method of the acquisition. If the property is deliberately acquired for the purpose of rental, then the rental is a business activity. *Oseroff v. City of Pittsburgh*, 70 Pa.Commonwealth Ct. 294, 453 A.2d 40 (1982) (property deliberately acquired for rental subject to city's tax on net profits and gross receipts, even though lessor did not provide even minimal service to lessee); *Philadelphia Tax Review Board v. Weiner*, 211 Pa.Superior Ct. 229, 235 A.2d

---

**3.** The instructions also discuss the nature of significant services as being provided primarily for the convenience of the occupant and not customarily provided in connection with rental of space for occupancy only—for example, maid service is a significant service, but providing heat and light, cleaning public entrances, lobbies, etc. and collecting trash are not. "Payments for the use or occupancy of an entire private residence or living quarters on duplex or multiple housing units or *offices in an office building generally are rents*." Stipulation of Facts, Exhibit C at C–7 (emphasis added).

184 (1967) (owners who deliberately acquired one-half interest in a building and then leased it were engaged in a "business" within the meaning of the Philadelphia Wage and Net Profits Tax, rather than merely receiving passive income). The Taxpayers argue that the sole purpose for M & M's existence and its participation in the acquisition of the building is the rental of that building to RSSM, therefore M & M's profit or loss comes from a business activity.

In response the Commonwealth urges the court to focus on the limited and exclusive nature of M & M's rental activity, rather than on the provision of services or M & M's intent to rent the building. It cites *Morgan v. Commonwealth*, 42 Pa.Commonwealth Ct. 557, 400 A.2d 1384 (1979). There an individual bought and sold securities for the purpose of making profit for himself; he held no license and did not offer his services to anyone else. He claimed certain expenses from his personal money management activity as expenses deductible from his operation of a business pursuant to Section 303(a)(2) of the TRC. This court disagreed, quoting the definition of "business" in Section 301(c) of the TRC, 72 P.S. § 7301(c), as " 'an enterprise, *activity, profession,* vocation, trade, joint venture, commerce or any other undertaking of any nature *when engaged in as commercial enterprise....' "* *Morgan,* 42 Pa.Commonwealth Ct. at 561, 400 A.2d at 1386 (emphasis added in *Morgan* ). We held that the sine qua non of a commercial enterprise is the rendering of goods and services to others in the marketplace, which clearly excluded the petitioner's activity.

The Commonwealth argues that here the Taxpayer as a partner of M & M renders services to himself as a partner of RSSM, and he functions in no marketplace. The Commonwealth quotes the Brief for Petitioner at 9:

After much consideration and study, the partners of RSSM determined it to be in their best interest to become an owner of the space in which they conducted their law practice. Due to a variety of considerations, including the legal, financial and other implications of real estate ownership by the law partnership, as well as federal income tax

issues, etc., it was decided that the ownership interest of the RSSM partners in the Law Office Building should be acquired using as a vehicle another partnership called M & M Enterprises rather than RSSM and that RSSM would pay rent to the owner of the Law Office Building.

Therefore, the Commonwealth asserts, M & M is the vehicle whereby RSSM owns its Pittsburgh headquarters, and this is the single reason for M & M's existence, and it was never intended that M & M participate in the real estate market in any other venture, nor has it. Further, the regular and periodic payments made by RSSM for the use and occupancy of property comport with the common meaning of "rent" according to dictionary definitions.[4]

We are constrained to agree with the Commonwealth. The Stipulations establish that only a member of RSSM is eligible to become a member of M & M, and when the extent of a partner's interest in RSSM changes there is an equal change in interest for the partner in M & M, and when a partner leaves RSSM that partner also must leave M & M. No one contests the reasonableness of the rent paid by RSSM and the depreciation taken on the building, but the Commonwealth scores a telling point insofar as serious "negotiations" between RSSM and M & M (or between RSSM and 435 Sixth Avenue Associates, which is dominated to the extent of 95% by M & M) are unrealistic. M & M is designed to do RSSM's bidding, not to engage actively in the business of real estate. These two entities, although enjoying a separate legal existence, work very much "hand in glove," and their relationship reflects the nature of the rental activity in which M & M is involved. As the Taxpayers admit in the Stipulations, M & M was created for the sole purpose of acquiring ownership of the space in which RSSM conducts its law practice. In *Morgan* this court interpreted the statutory definition of "business" as the rendering of goods and services in the marketplace. Applying this definition to the situation presented, we must

4. *E.g.,* "Consideration paid for use or occupation of property. In a broader sense it is the compensation or fee paid, usually periodically, for the use of any property, land, buildings, equipment, etc." Black's Law Dictionary 1166 (5th ed. 1979).

conclude that M & M's activity does not equate to doing "business." The income that M & M earns (and the losses that it generates) does not result from engaging in a "commercial enterprise" in the rental real estate market so as to render the activity a "business" within the meaning of Section 301(c) of the TRC.

■ In addition to the "business profits" versus "rents" argument, the Commonwealth references *Aronson v. City of Pittsburgh*, 86 Pa.Commonwealth Ct. 591, 485 A.2d 890 (1985). *Aronson* involved a taxpayer who engaged in both a law practice and a real estate business (both indisputably "businesses" within the meaning of Section 301(c) of the TRC). One of several consolidated appeals involved the taxpayer's assertion that losses from one business could be offset against earnings from the other for purposes of the net profits taxes imposed by his city and school district pursuant to The Local Tax Enabling Act,[5] and the Act of August 24, 1961, *as amended*, P.L. 1135, 24 P.S. § 588.2. The Taxpayers' effort to have the M & M losses characterized as net business losses rather than "rents" rests on the implicit assumption that losses from one business may be offset against gains from another for personal income tax purposes.

The Commonwealth argues that under *Aronson* a partner of RSSM could not offset losses from M & M even if both activities were regarded as businesses. There this court cited the definition of "net profits" in Section 1 of the Act of August 24, 1961, 24 P.S. § 588.1, as " 'the net gain from the operation of *a business*, profession or enterprise,' " *Aronson*, 86 Pa.Commonwealth Ct. at 597, 485 A.2d at 894 (emphasis added in *Aronson* ), and similar language in The Local Tax Enabling Act. We concluded that the statutes seek to impose the net profits tax on each business separately and that net profits of one business are to be determined with reference only to the gross income and expenses of that business, without mixing the income of one enterprise with the expenses of another.

5. Act of December 31, 1965, P.L. 1257, *as amended*, 53 P.S. §§ 6901–6924.

Although Section 303(a)(2) of the TRC defines the term "net profits" in nearly identical language, the Department itself nevertheless attributes a different interpretation to the term in the definition of "Income" in 61 Pa.Code § 101.1:

> The total of the classes enumerated under Chapter 103 Subchapter B (relating to determination of tax) received by a taxpayer directly, and the amount of each class derived by the taxpayer through estates or trusts. There may be no setoff between or among the classes. For example, an individual's net profit from manufacturing toys is $100, his net loss from the business of selling garden supplies is $20, his wife's loss from a business that she operates is $20, and his net loss from passive ownership of investment rental properties is $10. *His total net business profits are $80 which is his total income,* against which he may not set off his losses on rentals or his wife's business losses. (Emphasis added.)

*Aronson* involves different statutory provisions and is not controlling. Also, the Commonwealth's argument based on *Aronson* conflicts with the plain language of the Department's regulation at 61 Pa.Code § 101.1, and the Commonwealth does not formally challenge the validity of the regulation.

■ The Taxpayers also advance an alternative argument that the operations of RSSM and M & M are so interrelated and interdependent that they should be considered together as a single "business activity":

> RSSM and M & M were each established and maintain their current structure to achieve specific results related to financial, legal, federal income tax and various other issues relating to the practice of law by the RSSM partners. Looking through the legal entities to the actual impact on each of the individual RSSM partners, including Mr. Wettach, one cannot help but conclude that the profit or loss from the practice of law must take into account the profit or loss from owning the building in which RSSM practices law. These are not two independent activities, but rather, a single business activity conducted through two entities. To properly compute Mr. Wettach's share of the net profit from

the practice of law, one must consider the financial results of both RSSM and M & M.

Brief for Petitioner at 20–21. Therefore, the Taxpayers argue the losses of M & M are costs and expenses incurred in the conduct of the overall activity, which expenses are properly deducted under Section 303(a)(2) of the TRC and 61 Pa.Code § 103.12.

However, the court is confronted with two legal entities, not one. As the Taxpayers admit, the partners of RSSM very deliberately created M & M to achieve "specific results related to financial, legal, federal income tax and various other issues," which they regard as being more beneficial to them than direct acquisition of the building by RSSM (although they also intended to become "owners of the space in which they conducted their practice of law," Stipulation of Facts at 4). The court lacks the authority to "[look] through the legal entities," which were intentionally created, solely because one effect of this arrangement is an adverse result in regard to Pennsylvania Personal Income Tax liability of the partners.[6]

▆ Finally, the Taxpayers argue that even if the income from M & M is properly classified as "rents" rather than net profits from a business, the Department's express prohibition in 61 Pa.Code § 101.1 on any setoff between and among different classes is invalid because it exceeds the authority granted to the Department by the TRC. They contend that

---

**6.** The partners have not been deprived of all benefits from the depreciation. For M & M to experience a loss in 1987 it had to first offset its earnings of 95% of the rent RSSM paid to 435 Sixth Avenue Associates, some $3,727,800. *Compare Barasch v. Pennsylvania Public Utility Commission*, 120 Pa.Commonwealth Ct. 292, 548 A.2d 1310 (1988), where a regulated public gas utility was one of several subsidiaries of a parent corporation, which employed the Federal income tax option of consolidating returns of the subsidiaries and offsetting losses from some against earnings of others. Pennsylvania's "actual taxes paid" doctrine recognizes a utility's ratemaking expense for federal taxes only to the extent of the utility's proportionate share of the overall tax paid by the parent, after offsetting, rather than the full stand-alone liability that the subsidiary pays to the parent. We rejected the argument that the parent corporation's power to restructure so that the utility stood alone was relevant to the application of the doctrine—the freely chosen existing structure was the one at issue, and it was presumed to be beneficial to the parent corporation.

the prohibition on setoff goes beyond the requirements of Section 302.2, which states that a tax is imposed on the privilege of receiving income in each of the classes enumerated in Section 303. They cite *National Transit Co. v. Boardman*, 328 Pa. 450, 197 A. 239 (1938), where the Supreme Court held that the Secretary of Revenue does not have discretion to promulgate a regulation that authorized consolidated corporate tax returns to be filed only by corporations making consolidated reports to the federal government, where the tax statute governing consolidated returns contained no such provision.

Taxpayers also cite *Carlos R. Leffler, Inc. v. Commonwealth*, 124 Pa.Commonwealth Ct. 306, 556 A.2d 18 (1989), *aff'd per curiam*, 524 Pa. 585, 574 A.2d 600 (1990). There this court held that regulations of the Department defining the term "first sale" of petroleum products are within the rule-making authority granted to the Department under the TRC, because they do not change the ultimate statutory tax liability but simply streamline a process that in some cases required payment of the tax followed by a refund for sales ultimately shown to be exempt. The Taxpayers contend that the regulatory prohibition on setoffs among Section 303 classes, by contrast, increases their substantive tax liability.

In *Kalodner v. Commonwealth*, 150 Pa.Commonwealth Ct. 248, 255, 615 A.2d 900, 903 (1992), we recognized that "when a regulation is promulgated under an express grant of authority by the Legislature, it is valid and as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." The Commonwealth notes that Section 354 of the TRC, 72 P.S. § 7354, empowers the Department to promulgate and enforce rules and regulations relating to the Personal Income Tax, and that 61 Pa.Code § 101.1 was adopted according to proper procedure. The Commonwealth contends that it is reasonable because it serves the purpose of maintaining the eight separate classes. of income established in the TRC—to permit offsetting among them renders the categories a nullity and opens the door to tax shelters.

The answer to the Taxpayers' challenge lies in determining the intent of the legislature. The language of Sections 302.2 and 303 of the TRC imposes a tax on eight enumerated classes of income and does not unambiguously either prohibit or permit setoffs among the classes. One method of ascertaining legislative intent is to consider the administrative interpretations of a statute. The construction of a statute by those charged with its implementation should not be disregarded or overturned unless it is clearly erroneous. *Chappell v. Pennsylvania Public Utility Commission,* 57 Pa.Commonwealth Ct. 17, 425 A.2d 873 (1981). And, "It is established that administrative interpretations, not disturbed by the Legislature, are appropriate guides to legislative intent. 1 Pa.C.S. § 1921(c)(8)." *Hospital Association of Pennsylvania v. MacLeod,* 487 Pa. 516, 523 n. 10, 410 A.2d 731, 734 n. 10 (1980). The prohibition on setoffs has been in effect since the Department's adoption of the regulations implementing the Personal Income Tax on February 12, 1972, *see* 2 Pa.B. 259, 261 (1972), § 301(j)–1 "Income," and the legislature has left that scheme undisturbed. We must conclude that the Department's prohibition on setoff is within the intent of the legislature and so within the power of the Department under the TRC.

Accordingly, we affirm the order of the Board of Finance and Revenue upholding the adjustment to the Taxpayers' income made by the Department.

## ORDER

AND NOW, this 4th day of February, 1993, the order of the Board of Finance and Revenue at Docket No. RPIT–6795, dated April 24, 1990, is affirmed. Judgment shall be entered unless exceptions are filed within thirty days, pursuant to Pa.R.A.P. 1571(i).