**Robert J. MARSHALL, Jr., Petitioner**

**v.**

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 8, 2011.

Decided Jan. 3, 2012.

Joseph C. Bright, Philadelphia, for petitioner.

Kevin A. Moury, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and PELLEGRINI, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.[1]

OPINION BY Judge BROBSON.

"The hardest thing in the world to understand is the income tax." These words by Albert Einstein ring particularly true in this case. On its face, the Pennsylvania personal income tax (PIT) seems simple enough. Residents and nonresidents are obligated to remit a tax on each dollar of income at a rate of 3.07%.[2] For residents, that percentage applies to all income received in a taxable year. For nonresidents, the percentage applies only to income from sources within the Commonwealth. As this case illustrates, however, particular circumstances can morph a relatively simple mathematical computation into a Gordian knot. Here, the Court must consider application of the PIT to a nonresident, who invested as a limited partner in a Connecticut limited partnership, which owned a building in the City of Pittsburgh, which went into foreclosure.

## I. BACKGROUND[3]

Petitioner Robert J. Marshall, Jr. (Marshall) challenges a Board of Finance and Revenue (Board) Order, which confirmed a decision by the Department of Revenue (Revenue) imposing PIT on Marshall, a nonresident,[4] for "income" from the foreclosure of a commercial property in the City of Pittsburgh (Property) in 2005. 600 Grant Street Associates Limited Partnership (Partnership), organized under Connecticut law, purchased the Property for $360 million.[5] Of this $360 million purchase price, the Partnership financed $308 million with a Purchase Money Mortgage Note (PMM Note) secured only by the Property. The PMM Note was nonre-

---

1. This case was decided before Judge Butler's term ended on January 2, 2012.

2. Section 302 of the Tax Reform Code of 1971 (Code), Act of March 4, 1971, P.L. 6, added by the Act of August 4, 1991, P.L. 97, *as amended*, 72 P.S. § 7302.

3. The background is drawn from the parties' Joint Stipulation of Facts (Stipulation) and accompanying exhibits, which we adopt as our findings of fact in this *de novo* tax appeal.

4. At all times relevant to this matter, Marshall has been a resident of the State of Texas.

5. Interestingly, the parties' Stipulation uses the word "approximately" when referring to the acquisition price of the Property and other relevant values. We will proceed, as the parties do in their briefs, as if the "approximate" is actual.

course, meaning that the Partnership and the lender agreed that the lender's only recourse for nonpayment of the obligations under the PMM Note was to pursue foreclosure of the Property. As the name of the Partnership suggests, the Partnership's primary purpose was the ownership and management of the Property.

Interest on the PMM Note accrued on a monthly basis at a rate of 14.55%. If, however, the monthly accrued interest exceeded the net operating income of the Partnership, the Partnership was not required to pay the excess (*i.e.*, the amount of monthly accrued interest less monthly net operating income). Instead, the accrued but unpaid excess would be deferred and, thereafter, compounded on an annual basis subject to the same interest rate as the principal amount of the PMM Note. The original maturity date of the PMM Note was November 1, 2001. In 1998, the lender and the Partnership amended the PMM Note to extend the maturity date to January 2, 2005.

Marshall purchased a limited partnership interest (one unit) in the Partnership on or about January 24, 1985, for $148,-889—$5,889 in cash and a promissory note of $143,000. His one unit limited partnership interest amounted to a 0.151281% interest in the Partnership. Marshall paid the promissory note in full on or about May 13, 1992. In March 1989, the Partnership returned a portion of Marshall's capital contribution in the amount of $6,184. Marshall was a passive investor in the Partnership. He never participated in the management of the Partnership or the Property.

Over the years, the Partnership's net income from operations did not keep pace with projections. The Partnership actually incurred losses from operations for financial accounting, federal income tax, and PIT purposes every year of its existence. For PIT purposes, the Partnership allocated its annual losses from operations to each partner, including Marshall. During this same time, Marshall had no other Pennsylvania source of income or loss. Marshall thus did not file a PIT return for tax years 1985 through 2004.

Because of the Partnership's dismal operations, the Partnership paid less monthly interest on the PMM Note than it had projected. Under the terms of the PMM Note, this led to a greater amount of accrued but unpaid interest over the years. According to the Offering Memorandum, the Partnership projected accrued but unpaid interest on the PMM Note at maturity (November 1, 2001, later extended to January 2, 2005) to be approximately $300 million. It also projected that upon sale of the Property at maturity, there would be enough proceeds to pay off the principal and accrued interest on the PMM Note, with additional funds available to distribute to the partners as a return on their investment. (Stip.¶¶ 32, 33.) At the date of foreclosure, the Partnership had an accrued but unpaid interest obligation of approximately $2.32 billion. (*Id.* ¶ 37.) The Partnership had used approximately $121,600,000 of this amount to offset its income from operations that would otherwise have been subject to PIT. Neither the Partnership nor Marshall derived any PIT benefit from the remainder. (*Id.* ¶ 38.)

The lender foreclosed on the Property on June 30, 2005. By that time, what began as a $308 million Partnership liability on the PMM Note had grown into a liability of more than $2.6 [6] billion, of which only $308 million represented principal. Neither the Partnership nor its individual partners received any cash or other prop-

---

**6.** According to the parties' stipulation, the "approximate" number is $2,628,497,551.

erty as a result of the foreclosure. That same year, the Partnership terminated operations and liquidated. Marshall did not recover his $142,705 capital investment (original investment less return of capital) in the Partnership at foreclosure or liquidation. Indeed, Marshall did not receive any cash or other property upon liquidation of the Partnership.

In a Notice of Assessment dated March 28, 2008, Revenue assessed Marshall $165,055.24 in PIT for calendar year 2005 (inclusive of penalties and interest) as a result of the foreclosure on the Property (Assessment). Marshall filed a petition for reassessment with Revenue's Board of Appeals (BOA), challenging the imposition and, in the alternative, amount of PIT set forth in the Assessment. On September 12, 2008, BOA struck the penalties from the Assessment, but otherwise held that the amount of PIT due, with interest, was proper. Marshall appealed BOA's determination to the Board, which denied Marshall's request for relief from the BOA's determination on December 16, 2008. This appeal[7] followed.

Marshall raises several issues for our consideration, which we will restate for purposes of our analysis. First, Marshall argues that because neither the Partnership nor the partners received any cash or other property upon foreclosure of the Property, no PIT is owed as a result of the foreclosure. Second, Marshall argues that imposition of an income tax on a taxpayer, like himself, who actually derived no income from his investment is prohibited by our prior decision in *Commonwealth v. Rigling*, 48 Pa.Cmwlth. 303, 409 A.2d 936 (1980), and the court of common pleas' decision in *Commonwealth v. Columbia Steel & Shafting Co.*, 83 Pa. D. & C. 326 (Dauphin 1951), *exceptions dismissed*, 62 Dauph. 296 (Dauphin 1952). In his third issue, Marshall argues that application of the PIT to him in this instance is unconstitutional, because it treats him differently from the partners who reside in Pennsylvania.[8] Fourth, Marshall claims that Revenue failed to apply the tax benefit rule—both generally and as set forth in the Pennsylvania Personal Income Tax Guide (PIT Guide),[9] which Revenue publishes on its website—in calculating the amount of PIT Marshall owes. Finally, Marshall argues that he is not subject to the PIT because he lacked sufficient minimum contacts with Pennsylvania.

## II. ANALYSIS

### A. MINIMUM CONTACTS

We are compelled to take Marshall's arguments out of order, because if he is not subject to PIT, it matters not whether Revenue properly calculated his PIT liability. Marshall argues that he is not subject

---

**7.** Our standard of review in this matter is covered by Rule 1571 of the Pennsylvania Rules of Appellate Procedure. *See* Pa. R.A.P. 1571. "Appeals taken from the Board of Finance and Revenue are *de novo* in nature, with no record being certified by the board." *Tool Sales & Serv. Co. v. Bd. of Fin. & Revenue*, 536 Pa. 10, 16, 637 A.2d 607, 610 (1993), *cert. denied* sub nom. *Tom Mistick & Sons, Inc. v. Pennsylvania*, 513 U.S. 822, 115 S.Ct. 85, 130 L.Ed.2d 37 (1994). "Although the Court hears these cases under its appellate jurisdiction, the Court functions essentially as a trial court." *Scott Elec. Co. v. Commonwealth*, 692 A.2d 289, 291 (Pa.Cmwlth.1997),

*exceptions dismissed*, 704 A.2d 205 (Pa. Cmwlth.1998).

**8.** Out of approximately 735 limited partners in the Partnership, 25 were Pennsylvania residents.

**9.** The parties have included in their Stipulation as Exhibit "K" relevant excerpts of the PIT Guide in effect for the 2005 tax year. Unless otherwise indicated, references herein to the PIT Guide will be to the version included in the Stipulation.

to PIT because he is not a resident of the Commonwealth and does not have sufficient minimum contacts with the Commonwealth, such that the Commonwealth may tax him without violating the Commerce and Due Process Clauses of the United States Constitution.[10] Relying on paragraph 9 of the Stipulation, Marshall's argument is as follows:

> Here, Mr. Marshall had no minimum contacts with Pennsylvania. He did not reside in or conduct any activities in Pennsylvania. Similarly, his interest in the Partnership was never employed as capital or localized in connection with a trade or business so as to establish a business situs for the interest of Pennsylvania. *Without such minimum contacts,* a state may not tax an individual whose only connection with the state is a passive limited partnership interest in a partnership doing business in that state.

(Marshall Br. at 28 (emphasis added).)

 We conclude that Marshall has waived his Commerce Clause challenge. In *Quill Corporation v. North Dakota,* 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), the United States Supreme Court held that "the Due Process Clause and the Commerce Clause are analytically distinct" and, thus, analysis of the two should not be intermingled. *Quill,* 504 U.S. at 305–06, 112 S.Ct. 1904. In his Brief, Marshall argues only that he lacks "minimum contacts" with the Commonwealth. "Minimum contacts" is the test to determine whether application of a state's tax scheme

to a nonresident violates due process. *See id.* at 306, 112 S.Ct. 1904; *Equitable Life Assurance Soc'y of the U.S. v. Murphy,* 153 Pa.Cmwlth. 338, 621 A.2d 1078, 1091 (1993). Whether a taxing scheme violates the Commerce Clause requires application of a four-part test, the first prong of which requires a court to consider whether the tax "is applied to an activity with a substantial nexus with the taxing State." *Quill,* 504 U.S. at 311, 112 S.Ct. 1904; *Equitable Life,* 621 A.2d at 1093. Though the "minimum contacts" test and the "substantial nexus" prong are similar in phrasing, the Supreme Court in *Quill* rejected the State of North Dakota's argument that they are one and the same: "The two standards are animated by different constitutional concerns and policies." *Quill,* 504 U.S. at 312, 112 S.Ct. 1904. In light of *Quill,* because Marshall failed to present any separate argument in his brief directed to his Commerce Clause challenge, that challenge is waived. Pa. R.A.P. 2119; *see Purple Orchid, Inc. v. Pa. State Police,* 572 Pa. 171, 176–77, 813 A.2d 801, 804 (2002) (holding issue waived by failure to address and develop in appellate brief).

 This leaves Marshall's constitutional challenge to the PIT on due process grounds.[11] In *Equitable Life,* we explained the minimum contacts test in relation to extra-territorial taxation as follows:

> [The Due Process Clause] protects citizens from unfair tax burdens by limiting the power of states and their political subdivisions to impose extra-territorial

---

**10.** U.S. Const. art. I, § 8, cl. 3; U.S. Const. amend. XIV, § 1.

**11.** A taxpayer challenging the constitutionality of tax legislation bears a heavy burden. *Leonard v. Thornburgh,* 507 Pa. 317, 320–21, 489 A.2d 1349, 1351 (1985). The legislature has wide discretion in matters of taxation. *Id.* at 320, 489 A.2d at 1351. It is well-established that tax legislation is presumed to

be constitutionally valid and will not be declared unconstitutional unless it "clearly, palpably, and plainly violates the Constitution." *Free Speech, LLC v. City of Philadelphia,* 884 A.2d 966, 971 (Pa.Cmwlth.2005). Furthermore, "[a]ny doubts regarding the constitutionality of tax legislation should be resolved in favor of upholding its constitutionality." *Id.*

taxation. In order to comply with due process requirements, the United States Supreme Court has determined that such taxation be restricted to cases where there exists "some definitive link, some minimal connection, between the state and the person, property or transaction it seeks to tax," and has required the taxes imposed bear a "rational relationship" to the protections, opportunities and benefits given by the taxing authority. The simple but controlling question is whether the taxing authority has given *anything* for which it can ask in return.

*Equitable Life*, 621 A.2d at 1091 (citations omitted) (quoting *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954), and *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978)) (emphasis in original). We are also guided by the United States Supreme Court's observations in *Kulko v. Superior Court of California:*

> Like any standard that requires a determination of "reasonableness," the "minimum contacts" test ... is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present. We recognize that this determination is one in which few answers will be written "in black and white. The greys are dominant and even among them the shades are innumerable."

436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (citation omitted) (quoting *Estin*

*v. Estin*, 334 U.S. 541, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948)).

With this guidance, we conclude that imposition of the PIT on Marshall, as a limited partner of the Partnership, as a result of the disposition of the Property at foreclosure does not violate Marshall's due process rights. Marshall would have us focus solely on his status as a limited partner in the Partnership and, consequently, his limited, if not nonexistent, right to control the Partnership's business affairs. That, however, is a superficial analysis. Marshall did not simply passively invest in a Connecticut limited partnership, as one would trade stocks on a stock exchange. To the contrary, he invested in a specific and limited purpose Connecticut limited partnership, whose "primary purpose was ownership and management" of a substantial commercial property in the City of Pittsburgh—"a sixty-four story office tower and related site improvements, known as the United States Steel Building ... and the underlying parcel of land of approximately 2.676 acres." (Stip. ¶ 11 & Ex. "G" at 3.) [12] The investment objectives and policies of the Partnership were directed to maximizing the partners' return on their investment through the Partnership's ownership of the Property. Marshall knew all of this when he chose to invest in the Partnership as a limited partner. He purposefully availed himself of the opportunity to invest in Pennsylvania real estate through a partnership. These are sufficient minimum contacts for the imposition of a tax on Marshall and his fellow partners upon disposition by the Partnership of the Property.[13]

*Alabama Department of Revenue*, 968 So.2d 18 (Ala.Civ.App.2006), *cert. denied* (Ala.2007), and *BIS LP, Inc. v. Director, Division of Taxation*, 25 N.J.Tax 88 (2009), which Marshall cites in his brief. Thus, we are neither bound nor persuaded by the cited Court of Civil Appeals of Alabama and New Jersey Tax Court decisions.

---

**12.** Indeed, it appears from the Stipulation and attached exhibits that purchase, management, and potential future disposition of the Property for the benefit of the partners was the Partnership's *only* purpose.

**13.** These facts, and the different tax schemes involved, distinguish this case from *Lanzi v.*

## B. PIT AND FORECLOSURE INVOLVING NONRECOURSE DEBT

Marshall's first two issues raise the question of whether the foreclosure on the Property triggered any PIT obligation under the governing statute and regulation. The first issue invites the Court to construe Section 103.13 of Revenue's regulations (Regulations), 61 Pa.Code § 103.13, which modifies Section 303(a)(3) of the Code, added by the Act of August 31, 1971, P.L. 362, *as amended,* 72 P.S. § 7303(a)(3), relating to income from the disposition of property.[14]

Section 302 of the Code provides for the imposition of the PIT as follows:

> (a) Every resident individual, estate or trust shall be subject to, and shall pay for the privilege of receiving each of the *classes of income hereinafter enumerated in section 303,* a tax upon each dollar of income received by that resident during that resident's taxable year at the rate of three and seven hundredths per cent.
>
> (b) Every nonresident individual, estate or trust shall be subject to, and shall pay for the privilege of receiving each of the *classes of income hereinafter enumerated in section 303* from sources within this Commonwealth, a tax upon each dollar of income received by that

nonresident during that nonresident's taxable year at the rate of three and seven hundredths per cent.

(Emphasis added.) As the language of this section suggests, Section 303 of the Code sets forth eight separate classes of income subject to taxation under Section 302 of the Code. The third class of taxable income is at issue in this appeal.

The statutory language defining this third class of taxable income is quite lengthy. For purposes of our analysis, we will focus on the following relevant statutory language:

> Net gains or income from disposition of property. Net gains or net income, less net losses, derived from the sale, exchange or other disposition of property, including real property, tangible personal property, intangible personal property or obligations issued on or after the effective date of this amendatory act by the Commonwealth; any public authority, commission, board or other agency created by the Commonwealth; any political subdivision of the Commonwealth or any public authority created by any such political subdivision; or by the Federal Government as determined in accordance with accepted accounting

---

14. When interpreting a statute or a regulation, this Court is guided by the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991, which provides that "the object of all interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a); *see Bayada Nurses, Inc. v. Commonwealth, Dep't of Labor & Indus.,* 958 A.2d 1050, 1055 (Pa.Cmwlth.2008) (holding statutory construction principles apply to interpreting regulations), *aff'd,* 607 Pa. 527, 8 A.3d 866 (2010). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby,* 577 Pa. 104, 123, 842 A.2d 389, 400 (2004). "When the words of a statute are clear and free from all ambi-

guity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction. 1 Pa.C.S. § 1921(c). Moreover, "[e]very statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S. § 1922(2). Thus, no provision of a statute shall be "reduced to mere surplusage." *Walker,* 577 Pa. at 123, 842 A.2d at 400. Finally, it is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1).

principles and practices. For the purpose of this article:

(i) For the determination of the basis of any property, real and personal, if acquired prior to June 1, 1971, the date of acquisition shall be adjusted to June 1, 1971, as if the property had been acquired on that date. If the property was acquired after June 1, 1971, the actual date of acquisition shall be used in determination of the basis.

Section 303(a)(3) of the Code. The relevant portion of Section 103.13 of the Regulations provides:

(a) *Gain or loss.* A gain on the disposition of property is recognized in the taxable year in which the amount realized from the conversion of the property into cash or other property exceeds the adjusted basis of the property. A loss is recognized only with respect to transactions entered into for gain, profit or income and only in the taxable year in which the transaction, in respect to which loss is claimed, is closed and completed by an identifiable event which fixes the amount of the loss so there is no possibility of eventual recoupment.

(c) *Basis.* If property is acquired by a taxpayer by inheritance, the basis shall be the fair market value at the date of death. If property is acquired by a taxpayer by gift, the basis shall be the same as it would be if the property had remained in the hands of the donor. Otherwise, the basis shall be the cost.

. . .

(e) *Gain or loss on property acquired on or after June 1, 1971.* The amount subject to tax shall be the net gains or net income less net losses derived from the sale, exchange or other disposition of property—real or personal, tangible or intangible—to the extent that the value of that which is received or receivable is greater than or, in the case of a loss, less than the basis of the taxpayer. The basis shall be increased by capital expenditures made after the property was acquired and decreased by depreciation or amortization, allowed or allowable, after the property was acquired.

(Emphasis in original.)

In his statutory construction argument, Marshall asks this Court to focus specifically on the following language in Section 103.13 of the Regulations: "A gain on the disposition of property is recognized in the taxable year in which *the amount realized from the conversion of the property into cash or other property* exceeds the adjusted basis of the property." (Emphasis added.) Marshall's argument is simple. In this case, the Property was not converted into cash or other property. The lender foreclosed on the Property. Because neither the Partnership nor its partners received any cash or property as proceeds from the foreclosure, Marshall argues that, under Revenue's regulation, there cannot be any taxable gain.

■ Revenue[15] counters that the Partnership realized a discharge of indebtedness in an amount exceeding $2.6 billion, and Marshall's distributive share of this amount was $3,976,417. Under federal law, foreclosure is treated as a sale or exchange of the foreclosed property for an amount equal to the outstanding balance of the mortgage. Revenue takes the position that the discharge of a debt must be construed as a valid form of consideration when property is sold, or, as in this case, foreclosed upon. Otherwise, Revenue ar-

---

**15.** For purposes of continuity with the administrative proceeding below, "Revenue" is used herein to refer also to the named Respondent in this matter, the Commonwealth of Pennsylvania.

gues, the PIT "has a huge hole built right into it" that would allow the use of debt discharge to avoid the tax. Revenue applies a rule of statutory construction to suggest that the regulation should not be interpreted as intending "a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1). In support of its argument, Revenue relies heavily on the United States Supreme Court's opinion in *CIR v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983) (*Tufts*). Revenue contends that, under *Tufts*, where a lender forecloses on property securing a nonrecourse loan of a partnership, for tax purposes the amount realized by the partnership from the disposition of the property is the full amount of the nonrecourse obligation.

In response, Marshall contends that the regulation does not use the word "consideration"; rather, it uses the words "cash or other property." In addition, Marshall claims that *Tufts* is inapposite, or, in the alternative, it has limited application. Specifically, Marshall emphasizes that in *Tufts*, the Supreme Court held that the entire amount of the nonrecourse obligation at issue in that case should have been the amount realized for tax purposes because the owners used all of those funds to purchase the property at issue, thus including that amount of the indebtedness in the basis [16] of the property. Here, however, the only portion of the loan obligation the Partnership received and booked as basis in the Property was the principal amount. Even if *Tufts* is applicable, then, Marshall argues that it does not allow

Revenue to include in the amount realized from foreclosure the accrued but unpaid interest on the nonrecourse obligation.

■ In interpreting Section 103.13 of the Regulation and its application in this setting, we are guided by the following:

Well-settled precedent establishes that courts defer to an administrative agency's interpretation of its own regulations unless that interpretation is unreasonable. The task of the reviewing court is limited to determining whether the agency's interpretation is consistent with the regulation and with the statute under which the regulation was promulgated. The United States Supreme Court has referred to this deference as the interpretive lawmaking power of administrative agencies and has characterized it as a "necessary adjunct" of the authority to promulgate and enforce regulations.

*Dep't of Envtl. Prot. v. N. Am. Refractories Co.*, 791 A.2d 461, 464–65 (Pa.Cmwlth. 2002) (citations omitted) (citing *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)).

■ In this matter, Revenue has interpreted Section 103.13(a) of its Regulations as applying to real property foreclosures, even when the mortgagor does not receive any cash or other property (*i.e.*, proceeds) upon foreclosure. This is a reasonable interpretation. In reaching this conclusion, we are persuaded by the similarities between the language in the state tax scheme and its federal counterpart.[17] As

---

**16.** In tax accounting, the term "basis" is used "to describe the value assigned to an asset for the purpose of determining gain (or loss) on the sale or transfer" of the asset. Black's Law Dictionary at 151 (6th ed.1990). Basis is generally determined at the time the asset is acquired and is based on the cost of acquisition. Basis, under certain circumstances,

may be adjusted upward or downward, yielding an "adjusted basis." *See id.* at 153; 26 U.S.C. §§ 1011, 1016; 61 Pa.Code § 103.13(e).

**17.** A court may seek guidance from federal case law, federal regulations, and a federal agency's rulings interpreting a similar federal

noted above, Section 103.13(a) of the Regulations provides that "[a] gain on the disposition of property is recognized in the taxable year in which the *amount realized* from the conversion of the property into *cash or other property* exceeds the adjusted basis of the property." (Emphasis added.) Marshall would have this Court focus on the "cash or other property" phrase, as if the inclusion of this phrase was somehow unique to Pennsylvania tax law. It is not.

Section 1001 of the Internal Revenue Code (IRC), 26 U.S.C. § 1001, provides the following with respect to computation of gains or losses from sale or disposition of property, in relevant part:

> **(a) Computation of gain or loss.**— The gain from the sale or other disposition of property shall be the excess of the *amount realized* therefrom over the adjusted basis provided in section 1011 [26 U.S.C] for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

> **(b) Amount realized.**—The amount realized from the sale or other disposition of property shall be the sum of *any money received plus the fair market value of the property (other than money) received* . . . .

(Emphasis added.) Like Pennsylvania tax law, then, federal tax law also references receipt of cash ("money") or "property (other than money)" in order to determine how to calculate a gain or loss from the sale or disposition of property. Federal courts construing these like provisions, however, have not adopted the narrow interpretation that Marshall advocates in this case. Indeed, Marshall concedes in

paragraph 54 of the Stipulation that "[f]or federal income tax purposes, a foreclosure on a nonrecourse mortgage is treated as a sale or exchange of the foreclosed property for an amount equal to the outstanding balance of the mortgage." Though not technically a fact, this concession of the law by Marshall is accurate. *See, e.g., Cox v. C.I.R.*, 68 F.3d 128, 133 (5th Cir.1995) ("It is a well-established rule that a foreclosure sale constitutes a 'disposition of property' within the meaning of I.R.C. § 1001."). Accordingly, because Revenue's interpretation of its regulation is consistent with well-settled interpretations of similar federal tax provisions, Revenue's interpretation of Section 103.13 as applying to real property foreclosures, even when the mortgagor does not receive any cash or other property (*i.e.*, proceeds) upon foreclosure, is reasonable and will not be disturbed by this Court.

█ Notwithstanding the foregoing, in his second issue on appeal Marshall argues that under *Rigling* and *Columbia Steel*, Revenue is prohibited from taxing him because he actually derived no income from his investment of $142,705 in the Partnership. In fact, Marshall lost the entirety of his investment. In response, Revenue eschews Marshall's reliance on *Rigling* and *Columbia Steel*, distinguishing both cases on their facts. We agree with Revenue that *Rigling* and *Columbia Steel* do not support Marshall's argument.

Marshall conflates the alleged loss of the money he paid to purchase his limited partnership interest with his tax liability as a partner in the Partnership. In *Smith v. Commonwealth*, we observed

---

statute where, as here, Pennsylvania courts have not interpreted the language in question. *See Dep't of Labor & Indus., Bureau of Labor Law Compliance v. Stuber*, 822 A.2d 870 (Pa. Cmwlth.2003), *aff'd*, 580 Pa. 66, 859 A.2d

1253 (2004); *Riedel v. Human Relations Comm'n of Reading*, 756 A.2d 142 (Pa. Cmwlth.2000); *Gosewisch v. Dep't of Revenue*, 40 Pa.Cmwlth. 565, 397 A.2d 1288 (1979).

several relevant principles of law pertaining to partnerships. The Partnership Code [15 Pa.C.S. § 8311] defines a partnership as an association of two or more persons to carry on as *co-owners* a business for profit.[18] A partnership, unlike a corporation, is not recognized as an entity that is separate and distinct from that of the individuals who compose it.

684 A.2d 647, 648–49 (Pa.Cmwlth.1996) (emphasis in original) (citation omitted). We then noted how this principle is followed in the Section 306 of the Code, added by the Act of August 31, 1971, P.L. 362, *as amended,* 72 P.S. § 7306, which provides:

A partnership as an entity shall not be subject to the tax imposed by this article, but the income or gain of a member of a partnership *in respect of said partnership* shall be subject to the tax and the tax *shall be imposed on his share, whether or not distributed, of the income or gain received by the partnership* for its taxable year ending within or with the member's taxable year.

(Emphasis added.) At issue in this case is whether *the Partnership* experienced a taxable gain for PIT purposes upon foreclosure of the Property, not whether Marshall, individually, received a positive return on his investment in the Partnership. If the Partnership experienced a taxable gain, under Section 306 of the Code Marshall is responsible to pay his share (based on his percentage ownership interest in the Partnership) of the Partnership's tax liability on that gain. Whether Marshall suffered a loss of the amount he invested in the Partnership, though unfortunate, is simply not relevant to the PIT question before us in this case.

*Rigling* and *Columbia Steel* do not compel a different conclusion. In *Rigling,* individual taxpayers challenged Revenue's calculation of PIT due on the 1972 sale of stock acquired prior to June 1, 1971. At issue was Revenue's application of Section 303(a)(3)(i) of the Code, which provides:

For the determination of the basis of any property, real or personal, if acquired prior to June 1, 1971, the date of acquisition shall be adjusted to June 1, 1971, as if the property had been acquired on that date. If the property was acquired after June 1, 1971, the actual date of acquisition shall be used in determination of the basis.

Revenue assessed PIT liability on the individual taxpayers, using the cost of the stock had it been purchased on June 1, 1971. The taxpayers argued, however, that doing so created an artificial gain where none existed, because the taxpayers' actual purchase price for the stock exceeded the cost as of June 1, 1971. As we noted: "As a result, the Department subtracted from sale price the artificially low June 1, 1971 basis and imputed to taxpayers a recognized gain that was greater than the gain they actually realized." *Rigling,* 409 A.2d at 939.

We held that this result was unreasonable and absurd and, therefore, could not have been what the General Assembly intended when it amended the Code to include the statutory language in question:

Since the unrealized and unrealizable "benefit" taxed by the Department is not income within the meaning of Article III of the Code, and since the taxation of such as "income" would be, in our view, both absurd and unreasonable, we hold that the General Assembly did not intend through its amendment to Section 303(a)(3) to substitute June 1, 1971 value

---

**18.** *See also* Section 301(n. 0) of the Code, added by the Act of August 31, 1971, P.L. 362, *as amended,* 72 P.S. § 7301(n.0) (definition of "partnership").

for actual acquisition cost of property acquired prior to that date in those instances in which actual acquisition cost exceeds June 1, 1971 value. To put it another way, we construe the Section 303(a)(3) basis language to mean that, as to property acquired prior to June 1, 1971, gain should be measured using either value at acquisition date or value as of June 1, 1971, whichever is greater; in no case may the June 1, 1971 value be imposed to create and tax gain never in fact realized by the taxpayer.

In so holding, we note that both the Supreme Court of the United States and the appellate courts of other states have considered income tax statute basis provisions similar to Pennsylvania's basis provision and have interpreted them consistent with the construction we here adopt.

*Id.* at 940.[19]

Because Marshall lost the entirety of his $142,705 investment in the Partnership, he claims that he is similarly situated to the taxpayers in *Rigling* and that we, therefore, should similarly find the imposition of a PIT against him in this case absurd. But the PIT at issue in this case is not PIT on a phantom gain on Marshall's investment in the Partnership; rather, it is PIT attributable to Marshall as a partner in the Partnership on the occasion of a taxable event—the disposition of Partnership property. What Marshall actually paid for his interest in the Partnership is irrelevant to the calculation of the gain or loss occasioned by this disposition of the Partner-ship's property. It does not factor into the amount realized from the disposition (*i.e.*, what the Partnership realized upon foreclosure of the Property), the original basis of the Property,[20] or the adjusted basis of the Property.[21] Accordingly, neither the Court's holding nor its rationale in *Rigling* can be applied in this case to preclude imposition of the PIT. The issue here is whether the Partnership encountered a gain on disposition of the Property, not whether Marshall recovered the purchase price of his Partnership interest or, stated otherwise, suffered a loss on his investment.

The 1951 decision of the Court of Common Pleas of Dauphin County in *Columbia Steel* deserves much less attention, because the court's analysis in that case turned on an interpretation of a corporate tax statute that is not at issue in this case (and has long since been repealed by the General Assembly). The holding in *Columbia Steel*—i.e., that under the statute in question, the corporate net income tax could not be assessed against a corporation that did not, by definition under the statute, have income—has no bearing on to the questions now before the Court. Accordingly, Marshall's reliance on *Columbia Steel* is misplaced.

### C. Calculation of PIT

Having established that Revenue is not precluded from imposing a PIT on Marshall, we now turn to the related question of whether Revenue has appropriately cal-

---

**19.** We note that at some point after this Court's decision in *Rigling,* Revenue amended its Regulations to provide for the calculation of basis of property acquired prior to June 1, 1971, in accord with our opinion. *See* 61 Pa.Code § 103.13(f).

**20.** "[T]he basis shall be the cost" of acquiring the property. 61 Pa.Code § 103.13(c).

**21.** "The basis shall be increased by capital expenditures made after the property was acquired and decreased by depreciation, allowed or allowable, after the property was acquired." *Id.* § 103.13(e).

culated the PIT due in this case.[22] Resolution of this question requires the Court first to resort to the relevant portions of the Code and the Regulations.

Section 103.13 of the Regulations provides *when* a gain from disposition of property is recognized. Simply stated, a gain is recognized where the amount realized from the disposition of the property exceeds the adjusted basis of the property at the time of disposition. Stated in mathematical terms:

$$Amount\ Realized - Adjusted\ Basis = Gain\ (or\ loss)\ [23]$$

### 1. Adjusted Basis

The Partnership did not acquire the Property by inheritance or by gift. Accordingly, under Section 103.13(c) of the Regulations, the basis of the Property is the Partnership's cost in acquiring the Property. Under Section 103.13(e) of the Regulations, because the Partnership acquired the Property after June 1, 1971, the original basis must be increased by any capital expenditures that the Partnership made after it acquired the Property and decreased "by depreciation or amortization, allowed or allowable," after the Partnership acquired the Property. To calculate the Partnership's adjusted basis in the Property, then, the Court (and Revenue) must know the following facts: (1) the actual purchase price of the Property, (2) the amount of any capital expenditures by the Partnership in the Property after it acquired it, and (3) the amount of depreciation or amortization, allowed or allowable, to the Partnership on account of the Property after the Partnership acquired the Property.

■■■ The Partnership's initial PIT basis in the Property was $360,000,000—*i.e.*, the price it paid for the Property. (Stip. ¶ 69.) Though the parties stipulate that "[t]his basis was adjusted throughout the years the Partnership owned the Property" (*id.*), the Stipulation does not set forth the adjusted basis for the Property on the date of foreclosure or the amount of capital expenditures and depreciation or amortization, allowed or allowable, necessary for the Court to calculate the adjusted basis. Accordingly, at this point, the record is insufficient for the Court to determine the adjusted basis in the Property, which is a necessary component for determining whether there has been a taxable gain. In paragraph 88 of the Stipulation, the parties appear to recognize this deficiency in the record and seek additional time to supplement the record. We will instead remand this matter to the Board for a recalculation of PIT due in accordance with this opinion.[24]

---

**22.** This question is fairly subsumed within the first, second, and fourth issues that Marshall raises on appeal, as restated by the Court above. Moreover, the parties' briefs and paragraph 88 of their Stipulation reflect their view that Revenue's calculation of PIT owed by Marshall is before the Court for review in this appeal.

**23.** If, after applying this calculation, it is determined that a taxable gain did, in fact, occur, the PIT rate will be applied to the amount of the gain to determine the amount of PIT due by the Partnership. Then, in accordance with Section 306 of the Code, each partner of the Partnership will be allotted a share of the Partnership's PIT obligation based on each partner's percentage ownership interest in the Partnership.

**24.** Marshall argues that in calculating the adjusted basis, Revenue must apply Section 303(a.2) of the Code, added by the Act of June 29, 2002, P.L. 559, 72 P.S. § 7303(a.2). (Marshall Reply Br. at 6.) Marshall refers to this section as a statutory codification of the "tax benefit rule" as applied to the calculation of adjusted basis, citing as support Revenue's reference in its PIT Guide to the tax benefit rule when addressing partnership depreciation expenses. In this regard, Section 303(a.2) of the Code provides:

### 2. Amount Realized

We now turn our attention to determining the amount realized upon disposition of the Property. Revenue, citing *Tufts*, insists that the amount realized in this particular taxable event is the full amount of the debt satisfied upon foreclosure—*i.e.*, $2.6 billion. Marshall offers three positions. His primary argument is that the amount realized should be $0. His first alternative argument is that the amount realized should only include the principal amount of the loan used to purchase the property ($308 million). Marshall argues that the accrued but unpaid interest on the PMM Note, a much larger number, should not be included in the amount realized. If, however, some accrued but unpaid interest must be included in the amount realized, Marshall argues, as his second alternative argument, that the amount should be limited to that portion of the accrued but unpaid interest for which the Partnership received a PIT benefit—*i.e.*, that the Partnership used to offset Pennsylvania income to show no operating income in Pennsylvania in prior years. According to the Stipulation, that amount was $121,600,000. Marshall, therefore, offers three alternative figures for the amount realized from the foreclosure for PIT purposes, in order of preference: (1) $0; (2) $308 million; and (3) $429,600,000.

#### (a) Loan Principal

■ In light of the United States Supreme Court's decision in *Tufts*, the amount realized from the foreclosure of the Property must, at a minimum, include the principal amount of the PMM Note that the Partnership used to purchase the Property and included in the Partnership's original basis in the Property—$308 million. In *Tufts*, the Supreme Court considered the question of whether a taxpayer (a partner in a partnership) must include the unpaid balance of a nonrecourse mortgage when determining whether a tax is due upon sale of the property where the unpaid balance exceeds the fair market value of the property. *Tufts*, 461 U.S. at 302, 103 S.Ct. 1826. In that case, a partnership secured a $1,851,500 nonrecourse loan, secured by a mortgage, to purchase real property. The partnership subsequently

In computing income, a depreciation deduction shall be allowed for the exhaustion, wear and tear and obsolescence of property being employed in the operation of a business or held for the production of income. The deduction must be reasonable and shall be computed in accordance with the property's adjusted basis at the time placed in service, reasonably estimated useful life and net salvage value at the end of its reasonably estimated useful economic life under the straight-line method or other method prescribed by the department, except a taxpayer may use any depreciation method, recovery method or convention that is also used by the taxpayer in determining Federal net taxable income if, when placed in service, the property has the same adjusted basis for Federal income tax purposes and the method or convention is allowable for Federal income tax purposes at the time the property is placed in service or under the Internal Revenue Code of 1986, whichever is earlier. *The basis of property shall be reduced, but not below zero, for depreciation by the greater of.*

(1) The amount deducted on a return and not disallowed, *but only to the extent the deduction results in a reduction of income;* and

(2) The amount allowable using the straight-line method of depreciation computed on the basis of the property's adjusted basis at the time placed in service, reasonably estimated useful life and net salvage value at the end of its reasonably estimated useful economic life, *regardless of whether the deduction results in a reduction of income.*

(Emphasis added.) As noted above, we are remanding this matter to the Board due to our inability, from this record, to determine the adjusted basis of the property and at the parties' request. On remand, the Board should consider and, as appropriate, apply Section 303(a.2) of the Code.

sold the property. As consideration, the purchaser agreed to reimburse each partner his sale expenses up to a certain amount and to assume the obligation under the nonrecourse loan and mortgage.

For federal income tax purposes, the partners in *Tufts* reported a *loss* on the transaction. They reasoned that their adjusted basis in the property at the time of disposition was $1,455,740. The fair market value of the property, however, did not exceed $1,400,000. By subtracting the two, the partners calculated a partnership loss of $55,740 on the sale. The Commissioner of Internal Revenue (Commissioner) disagreed. He took the position that the partnership had actually recognized a gain of approximately $400,000 (representing the difference between the adjusted basis and the outstanding loan obligation that the purchaser assumed to purchase the property).

The Supreme Court agreed with the Commissioner's approach. Drawing from a decision by the Supreme Court thirty-five years earlier in *Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), the Supreme Court held that nonrecourse loans should be afforded the same treatment as ordinary, or true loans:

> Respondents received a mortgage loan with the concomitant obligation to repay by the year 2012. The only difference between that mortgage and one on which the borrower is personally liable is that the mortgagee's remedy is limited to foreclosing on the securing property. This difference does not alter the nature of the obligation; its only effect is to shift from the borrower to the lender any potential loss caused by devaluation of the property. If the fair market value of the property falls below the amount of the outstanding obligation, the mortgagee's ability to protect its interests is impaired, for the mortga-

gor is free to abandon the property to the mortgagee and be relieved of his obligation.

> This, however, does not erase the fact that the mortgagor received the loan proceeds tax-free and included them in his basis on the understanding that he had an obligation to repay the full amount. When the obligation is canceled, the mortgagor is relieved of his responsibility to repay the sum he originally received and thus realizes value....

*Tufts,* 461 U.S. at 311–12, 103 S.Ct. 1826 (footnote omitted) (citations omitted). Upon reaching this conclusion, the Supreme Court held that "a taxpayer must account for the proceeds of obligations he has received tax-free and included in basis," *id.* at 313, 103 S.Ct. 1826, opining:

> When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer.. When he fulfills the obligation, the repayment of the loan likewise has no effect on his tax liability.

> Another consequence to the taxpayer from this obligation occurs when the taxpayer applies the loan proceeds to the purchase price of property used to secure the loan. Because of the obligation to repay, the taxpayer is entitled to include the amount of the loan in computing his basis in the property; the loan ... is part of the taxpayer's cost of the property. Although a different approach might have been taken with respect to a nonrecourse mortgage loan, the Commissioner has chosen to accord it the same treatment he gives to a recourse mortgage loan. The Court approved that choice in *Crane,* and the respondents do not challenge it here. The choice and its resultant benefits to

the taxpayer are predicated on the assumption that the mortgage will be repaid in full.

When encumbered property is sold or otherwise disposed of and the purchaser assumes the mortgage, the associated extinguishment of the mortgagor's obligation to repay is accounted for in the computation of the amount realized. Because no difference between recourse and nonrecourse obligations is recognized in calculating basis, *Crane* teaches that the Commissioner may ignore the nonrecourse nature of the obligation in determining the amount realized upon disposition of the encumbered property. He thus may include in the amount realized the amount of the nonrecourse mortgage assumed by the purchaser. The rationale for this treatment is that the original inclusion of the amount of the mortgage in basis rested on the assumption that the mortgagor incurred an obligation to repay. Moreover, this treatment balances the fact that the mortgagor originally received the proceeds of the nonrecourse loan tax-free on the same assumption. Unless the outstanding amount of the mortgage is deemed to be realized, the mortgagor effectively will have received untaxed income at DC the time the loan was extended and will have received an unwarranted increase in the basis of his property.

*Id.* at 307–10, 103 S.Ct. 1826 (footnotes omitted).

The Supreme Court summarized its holding in *Tufts* as follows: "When a taxpayer sells *or disposes* of property encumbered by a nonrecourse obligation, the Commissioner properly requires him to include among the assets realized the outstanding amount of the obligation." *Id.* at 317, 103 S.Ct. 1826 (emphasis added). Revenue, here, seeks to apply this same principle in determining the amount realized by the Partnership upon foreclosure. As the United States Supreme Court found this to be a reasonable approach in the context of calculating federal taxes due upon the disposition of property, and in light of the similarities between the federal and state schemes, Revenue's approach is reasonable, and we will not disturb it. *See Dep't of Envtl. Prot.*, 791 A.2d at 464–65; *see also Dechert LLP v. Commonwealth*, 606 Pa. 334, 351, 998 A.2d 575, 586 (2010) (deferring to Revenue's interpretation of Code on case involving imposition of tax). Upon foreclosure of the Property, the Partnership realized income for PIT purposes in the form of extinguishment of its obligation to repay the principal amount of the PMM Note that the Partnership included in the initial basis of the Property—$308 million.

### (b) Accrued But Unpaid Interest

Revenue argues that *Tufts* also supports its approach to require the Partnership to realize upon the foreclosure of the Property income in the form of discharge of the obligation to repay all of the accrued but unpaid interest ($2.32 billion) on the PMM Note. We, however, are hesitant to rely only on *Tufts* for this proposition. Though the Court in *Tufts* addressed how to calculate income from the disposition of property, the disposition in *Tufts* was a sale, not a foreclosure. Also, the purchaser in *Tufts* assumed the outstanding *principal* obligation of the loan used to secure the property. There is no mention in the opinion of whether there was any accrued but unpaid interest, and, if so, whether the purchaser assumed that as well. Finally, in support of its decision, the Supreme Court relied heavily on the fact that the partnership had included the principal amount of the loan as part of the original basis in the property. Failure to include that amount as income upon disposition of

the property, the Supreme Court reasoned, would effectively have allowed the partnership to treat the loan as tax-free income. Here, however, Revenue asks us to include in the amount realized under *Tufts* $2.32 billion in accrued but unpaid interest on the PMM Note that the Partnership did not, and for obvious reasons could not, count toward its original basis in the Property. Thus while *Tufts* is instructive, it does not seem to support fully Revenue's position that the accrued but unpaid interest on the PMM Note must be included in the amount realized upon foreclosure of the Property in this case. For the same reasons we reject Revenue's reliance on *Tufts*, we do not adopt Marshall's preferred reading of *Tufts* on the question of whether accrued but unpaid interest should be included in the amount realized from the foreclosure of the Property.

Unfortunately, the parties' briefs do not give the Court any further direction on the treatment of the accrued but unpaid interest on the PMM Note. For simplicity, the question, restated, is whether the *Tufts* rule—*i.e.*, inclusion of discharge of indebtedness used to acquire property in amount realized upon disposition—may be extended to interest accrued but unpaid on that indebtedness between acquisition and foreclosure.

Our independent research has revealed one case that, though not directly on point, at least lends some credence to Revenue's approach. In *Allan v. Commissioner of Internal Revenue*, 856 F.2d 1169 (8th Cir. 1988), the taxpayers were partners in a limited partnership, which acquired an apartment building for $989,000, subject to a $943,500 nonrecourse mortgage. The Department of Housing and Urban Development (HUD) insured the mortgage.

The partnership defaulted, and HUD acquired the mortgage from the lender. HUD paid all real estate taxes due and charged the partnership the interest payments due on the mortgage:

> Pursuant to paragraph 10 of the mortgage, both types of *advances* were added to the mortgage principal, thus becoming nonrecourse; interest was charged, at the mortgage rate, on the increased principal amount. The Partnership deducted these amounts as they accrued.

*Allan*, 856 F.2d at 1171 (emphasis added). The partnership was unable to recover, and HUD initiated foreclosure proceedings. The partnership transferred the property to HUD by deed in lieu of foreclosure, and the partnership was relieved of its obligations under the mortgage.

The taxpayers claimed that the entirety of the outstanding mortgage debt, including charged interest, along with the real estate taxes that HUD paid, should be included in the amount realized under *Tufts*.[25] The Commissioner, however, argued that the transaction should have been bifurcated into two parts: (1) relief from the mortgage principal, and (2) relief from liability for accrued interest and taxes. The United States Tax Court agreed with the taxpayers—*i.e.*, that *Tufts* required the inclusion of the accrued interest and tax obligations in the amount realized from the disposition of the property. The Commissioner appealed.

The United States Court of Appeals for the Eighth Circuit agreed with the taxpayers that under *Tufts*, "the amount realized is the *full amount* of the nonrecourse liabilities which are discharged as a result of the transfer of the property." *Id.* at 1173

---

**25.** For reasons not clear from the Eighth Circuit's opinion, apparently the taxpayers in *Allan*, unlike the taxpayer in this case and in *Tufts*, sought to maximize the amount realized from the transaction at issue for tax purposes.

(emphasis added). The Eighth Circuit then addressed the question of whether HUD's advancement of interest payments, which pursuant to the terms of the mortgage increased the principal amount due of the loan, was a true debt obligation subject to *Tufts* treatment. It answered in the affirmative:

> Our review of the record indicates that the advances made by HUD were "true loans," which were secured by the Apartment. It is clear that the relationship between the Partnership and HUD was arms length, and there is no evidence to suggest that the mortgage or any of its terms, including paragraph 10, were entered into for tax-motivated reasons unrelated to standard commercial practice. Moreover, the record supports the contention that HUD advanced the carrying costs for legitimate business reasons; specifically, HUD apparently hoped that its loan would afford the Partnership additional time to work out of its financial difficulties, and thereby be able to repay HUD the full amount of the mortgage obligation. Finally, there is no doubt that had the Apartment recovered financially, the Partnership would have been legally obligated to repay the entire outstanding principal amount of the mortgage, including the advances and the interest thereon.
>
> . . .
>
> Because we hold that the advances made by HUD to pay interest on behalf of the Partnership constituted a true loan properly added to the nonrecourse obligation, it follows inexorably that

those amounts are properly included in "amount realized" under *Tufts*.

*Id.* at 1173, 1174.

Though not identical, the Partnership had a similar arrangement with its lender in this case. If income from operations were not sufficient to make scheduled interest payments on the debt, the lender agreed to defer the interest obligation. Any deferred interest would be compounded on an annual basis subject to the same interest rate as the principal amount of the PMM Note. In other words, the lender financed the Partnership's interest payments. Had this been a successful investment, the Partnership would have sold the Property with sufficient proceeds to satisfy not only the principal amount owed on the PMM Note, but also any accrued but unpaid (deferred) interest.

Though we agree with Marshall that *Tufts* seems to tie the inclusion of debt satisfaction in the amount realized to its inclusion in the initial basis of the property, the Supreme Court's opinion also does not appear to prohibit what the Eight Circuit did in *Allan*. Marshall has not cited to any precedent, state or federal, where a court has held that accrued but unpaid interest should not be included in the amount realized under *Tufts*. Our research did not reveal any such precedent. Accordingly, we cannot say that Revenue's decision to include in the amount realized for PIT purposes the "full amount" of the nonrecourse liabilities discharged as a result of foreclosure (i.e., $2,628,497,551 (principal and interest)) is unreasonable or contrary to the Code and the Regulations.[26]

---

**26.** Based on the parties' Stipulation, it appears that the Partnership reported as the amount realized for federal tax purposes the full amount, principal and accrued but unpaid interest, as the amount realized on the foreclosure of the Property. This is exactly what Revenue did in this case. As noted above, the federal and state tax provisions relating to amount realized from the sale or disposition of property are sufficiently similar to justify Revenue's approach. We disagree with Marshall's characterization of Revenue's approach as cherry-picking from federal tax law. Rather, we see this simply as Revenue

### 3. Use of the Tax Benefit Rule to Reduce Amount Realized

Having concluded that accrued but unpaid interest can be included in the amount realized for PIT purposes, the follow-up question is whether the included amount must be limited to only the portion of the accrued but unpaid interest that the Partnership was able to deduct in prior years to reduce its PIT liability. This is Marshall's second alternative argument—*i.e.*, that only the portion of the accrued but unpaid interest which the Partnership was able to use to reduce its PIT in prior years ($121,600,000) should be included in the amount realized. Marshall supports his argument by referring us to the tax benefit rule.[27] Upon review of well-settled principles of Pennsylvania tax law, and considering the applicability of the tax benefit rule to this case, we reject Marshall's argument.

Certain stipulated facts are critical to our analysis. Specifically, the Stipulation provides:

> 72. The Partnership incurred *losses from operations* for PIT purposes *every year of its existence.* The calculation of the Partnership's overall losses from operations was determined through the netting of its gross receipts from operations and its deductible expenses incurred in operations. One of the deductible expenses used in determining the Partnership's overall *losses from operations* was annual depreciation deductions calculated with reference to the Partnership's PIT tax basis for the Property. *Another deductible expense used in determining the Partnership's overall losses from operations was both paid and unpaid interest accrued during the year on the nonrecourse debt due pursuant to the PMM Note.*

(Emphasis added.) From 1984 through foreclosure—a span of twenty-two (22) consecutive tax years, the Partnership used only $121,600,000 of the approximately $2.32 billion of unpaid interest that accrued over that period, along with other deductions, to offset fully its gross receipts from operations, leaving the Partnership with $0.00 in PIT liability for operating income during those tax years. (Stip.¶ 38.)

The following illustrates these undisputed facts:

### *Table 1*

### Partnership Income (Loss) from Operations
### 1984–2005 (in the aggregate)[28]

looking to its federal counterpart for guidance on how to interpret analogous state tax law. Any further attention to Marshall's cherry-picking accusation would be warranted only if Marshall could identify similar federal and state tax provisions applicable to this transaction where Revenue *did not* choose to act consistently with its federal counterpart. Marshall, however, does not direct us to any such instance in the record or his briefs.

27. Marshall, again referring to the PIT Guide, argues that the tax benefit rule should also be applied to reduce "the basis for his ownership interest in the Partnership." (Marshall Reply Br. at 7.) If the question of whether Marshall encountered a taxable gain on the sale of disposition of his Partnership interest was at issue in this case, we would address this argument. It is not. Here, the issue is whether *the Partnership* encountered a taxable gain on the sale or disposition of *the Property*. The basis of Marshall's ownership interest in the Partnership is not one of the factors used to calculate whether there has been a taxable gain on the sale or disposition of the Property. *See* Section 103.13 of the Regulations. Accordingly, we will not address this particular argument.

28. The letters X & Y are used herein for illustration, where the parties have not provided actual values. The actual values are not relevant to the Court's analysis.

| | |
|---|---|
| **Gross Receipts from Operations** | $X |
| LESS: | |
| Deductible Interest Expense | ($2,320,497,551) |
| Deductible Expenses (Other) | ($Y) |
| *Net Income (Loss) From Operations* | ($2,198,897,551) |

The above table illustrates the operating results for the Partnership from a book-keeping perspective. To reduce its PIT obligation for operating income to $0.00, however, it was not necessary for the Partnership to record a net *loss* from operations; rather, the Partnership needed only to show that it had no net income—*i.e.*, net income of *$0.00*. Accordingly, over the course of its twenty-two (22) years of operations, the Partnership incurred expenses well in excess of what it needed to produce $0.00 net income from operations for PIT purposes.

By stipulating that the Partnership only used $121,600,000 of the approximately $2.32 billion of unpaid PMM Note interest that accrued over that period "to offset its income from operations that otherwise would have been subject to PIT," the parties agree that *if* the accrued but unpaid interest on the PMM Note did not exist, the Partnership would have had taxable income from operations in the amount of $121,600,000, illustrated as follows:

The letters X & Y are used herein for illustration, where the parties have not provided actual values. The actual values are not relevant to the Court's analysis.

### *Table 2*

**Partnership Income from Operations
1984–2005 (in the aggregate)**

*Assuming No PMM Note Interest*

| | |
|---|---|
| **Gross Receipts from Operations** | $X |
| LESS: | |
| Deductible Expenses (Other) | ($Y) |
| *Net Income (Loss) From Operations* | $121,600,000 |

The following table, therefore, illustrates the extent to which the Partnership used the PMM Note interest to reduce the Partnership's net operating income to $0.00 and, consequently, its PIT liability to $0.00:

### *Table 3*

**Partnership PIT Liability from Operations Income
1984–2005 (in the aggregate)**

| | |
|---|---|
| **Gross Receipts from Operations** | $X |
| LESS: | |
| Used Deductible Interest Expense | ($121,600,000) |
| Deductible Expenses (Other) | ($Y) |
| *Net Income (Loss) From Operations* | $0.00 |
| *Unused (Orphaned) Interest Expense* | ($2,198,897,551) |

We now fast-forward to tax year 2005, the year of foreclosure and the year at issue in this matter. As noted above, the Partnership had no net income from operations in 2005. The source of this dispute, however, is whether and, if so, to what extent the Partnership encountered income in the form of gain from the disposition of property in 2005. In this portion of the Opinion, we are focused on determining the "amount realized" from the disposition of the Property, from which the Partnership's adjusted basis in the Property would be deducted to determine whether there has been a taxable gain on the disposition. The amount realized from the disposition of the Property through foreclosure, as discussed in Section II, C, (2) of this Opinion, *before* consideration of whether the amount should be reduced to allow the Partnership to benefit from unused or orphaned interest expense, is *$2,628,497,551* (the outstanding amount of the Partnership's obligation on the PMM Note at the time of foreclosure, including both principal and interest). (Stip.¶ 37.) Marshall contends that this amount should be reduced, *or offset*, by the unused, or orphaned, aggregate amount of PMM Note interest noted in Table 3 above—*i.e.*, expense that the Partnership did not need and thus did not use to reduce its operating income to $0.00 for purposes of PIT.

We must reject Marshall's argument because it conflicts with two principles embedded in Pennsylvania law. First, unlike federal tax law, which taxes income as a single class—"gross income",[29] Pennsylvania law recognizes eight separate classes of income subject to PIT. *See* Sections 302 and 303 of the Code. The Regulations expressly prohibit taxpayers from offsetting, or netting, income and losses across classes:

> Under the provisions of Article III of the Tax Reform Code of 1971 (72 P.S. § § 7301–7361) a person *shall not be allowed to offset a gain in one class of income with a loss in another class of income. . . .*

61 Pa.Code § 121.13(a) (emphasis added);[30] *see Wettach v. Commonwealth,* 153 Pa.Cmwlth. 293, 620 A.2d 730 (1993) (upholding validity of offset prohibition in Revenue's Regulations), *aff'd per curiam,* 544 Pa. 473, 677 A.2d 831 (1995). Revenue argues that if we allow Marshall to offset the 2005 amount realized from the sale or disposition of the Property by the orphaned interest expense accumulated over the twenty-two years in which the Partnership operated, we would be authorizing that which the Regulations prohibit. We agree.

Income from sale or disposition of property, the income at issue in this case, is Section 303(a)(3) income under the Code. The interest on the PMM Note was an operations expense and thus could only be used, as it was, to reduce Section 303(a)(2) income under the Code—*i.e.*, net profits,

---

29. *See* 26 U.S.C. § 61(a).

30. This prohibition also appears in Section 101 of the Regulations, under the definition of "income":

> There is no setoff between, or among, any different classes of Personal Income Tax income. For example, an individual's net profit from manufacturing toys is $100, his net loss from the business of selling garden supplies is $20 and his net loss from passive ownership of investment rental properties is $10. His total net business profits are $80 which is his income, against which he may not set off his losses on rentals.

61 Pa.Code § 101.1. The prohibition also appears in Revenue's PIT Guide with express application to partnerships: "The partnership may not offset income or gain in one class of income with a loss in another class of income." (PIT Guide Ch. 16, at 8.)

or income from operations. The unused portion of that interest expense (Table 3) produced a net loss from operations, or net operating loss (NOL) over the course of the Partnership's existence (Table 1). If, as Marshall asks, we allow the Partnership to offset the amount realized from the disposition of the Property in 2005 by NOLs in the form of excess interest expense over the preceding twenty-two year period, we would unquestionably be acting contrary to the express and unambiguous terms of the Regulations, which prohibit offsetting a gain in one class of income (gain on sale or disposition of property) with a loss in another class of income (net profits, or income from operations).

In addition, Marshall asks us to allow the Partnership to use twenty-two years' worth of NOLs in an amount in excess of $2 *billion* to reduce the amount realized, and thereby reduce (or eliminate) the taxable gain from a single taxable event in 2005—the sale or disposition of the Property. We thus must also agree with Revenue that Marshall's argument invites this Court to recognize a NOL carryover deduction under Pennsylvania tax law for PIT where the General Assembly, intentionally it appears, has chosen to exclude NOL carryover deductions from the calculation of PIT.

The General Assembly knows how to include a NOL carryover provision in the Code. There exists in the Code a NOL carryover provision for those paying corporate net income tax (CNIT), as follows:

4. (a) For taxable years beginning in 1982 through taxable years beginning in 1990 and for the taxable year beginning in 1995 and each taxable year thereafter, a net loss deduction shall be allowed from taxable income as arrived at under subclause 1 or, if applicable, subclause 2. . . .

(b) A net loss for a taxable year is the negative amount for said taxable year determined under subclause 1 or, if applicable, subclause 2. Negative amounts under subclause 1 shall be allocated and apportioned in the same manner as positive amounts.

Section 401(3)4 of the Code, added by the Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7401(3)4. The General Assembly, however, placed several limitations on the amount of the NOL carryover deductions a corporation may take in any given tax year. For the tax year at issue in this case, the maximum possible NOL carryover deduction was $2 *million.* Section 401(3)4(c)(2)(B)(I) of the Code. Moreover, the deduction could not "include more than [$500,000], in the aggregate, of net losses from taxable years 1998 through 1994." Section 401(3)(4)(c)(1.1) of the Code.

■ In addition, the Code expressly precludes a corporation that elects to be treated as a Pennsylvania S corporation from taking a NOL carryover deduction. *See* Section 307.8(e) of the Code, added by the Act of December 23, 1983, P.L. 370, *as amended,* 72 P.S. § 7307.8(e). Under Sections 307.8 and 307.9 of the Code, added by the Act of December 23, 1983, P.L. 370, *as amended,* 72 P.S. § 7307.9, Pennsylvania S corporations do not pay CNIT; rather, its shareholders pay *PIT* on their pro rata share of the corporation's income.[31]

---

31. By the very nature of a corporation's election of Subchapter S treatment, "all gains and losses pass through the corporation to the individual shareholders." *In re Dobson's Estate,* 490 Pa. 476, 417 A.2d 138 (1980). A corporation's election to be taxed as an S-corporation allows "the shareholders of the corporation to be taxed subject to the Pennsylvania Personal Income Tax and not tax the corporation under the Corporate Net Income Tax." *Tygart Resources, Inc. v. Commonwealth,* 134 Pa.Cmwlth. 168, 578 A.2d 86 (1990) (footnote omitted), *affirmed per curiam,* 530 Pa. 199, 607 A.2d 1074 (1992). More-

In light of this, we must conclude that if we allow the Partnership to carryover over 20+ years of NOL deductions in an amount exceeding $2 *billion,* we would be acting contrary the General Assembly's intent as clearly expressed in the Code. The intent of the General Assembly in this regard is evident from (a) the inclusion of a NOL carryover deduction with respect to CNIT, (b) the exclusion of a NOL carryover deduction with respect to PIT, and (c) the express prohibition against Pennsylvania S corporations and their shareholders using the NOL carryover allowed with respect to the CNIT to reduce their PIT. Moreover, we cannot ignore that Marshall is asking this Court to allow the Partnership to carryover and deduct from 2005 income more than $2 *billion* in prior year NOLs, when, under the Code, not even corporations can carryover that much to reduce their CNIT. Although this Court is authorized to interpret the Code, Marshall would have us rewrite it. This we cannot do.

Without specifically addressing these elements of the Code, Marshall argues that under the tax benefit rule, we may (and, indeed, must) exclude from the amount realized upon disposition of the Property over $2 billion, because that amount represents the portion of the Partnership's interest deductions on the PMM Note for which the Partnership never received a tax benefit. One Pennsylvania commentator has described the tax benefit rule as follows:

> The rule is a judicially developed doctrine of both inclusion and exclusion from income. *The purpose is to avoid the anomalous tax results this would otherwise occur within a tax system because of the need for periodic accounting.* For example, an item of income in a current year is not taxable income if it represents a recovery of a deduction in a prior year that produced no tax benefit. The rule has been partially codified for federal purposes.

26 Summary of Pa. Jurisprudence 2d § 9.32 (2009) (emphasis added) (citation omitted). The rule, or doctrine, is a product of federal common law, created by our federal courts in response to anomalies arising out of application of the annual accounting system for taxes contained in the IRC. The United States Supreme Court has explained the genesis of the rule as follows:

> [T]he tax benefit rule [is] a judicially developed principle that allays some of the inflexibilities of the annual accounting system. An annual accounting system is a practical necessity if the federal income tax is to produce revenue ascertainable and payable at regular intervals. Nevertheless, strict adherence to an annual accounting system would create transactional inequities. Often an apparently completed transaction will reopen unexpectedly in a subsequent tax year, *rendering the initial reporting improper.* For instance, if a taxpayer held a note that became apparently uncollectable early in the taxable year, but the debtor made an unexpected financial recovery before the close of the year and paid the debt, the transaction would

over, an S-corporation may "avoid tax at the corporate level and require the individual shareholder to pay tax on corporate earning *whether or not distributed to the shareholders."* *Fennell v. Fennell,* 753 A.2d 866, 867 (Pa.Super.2000) (citing *Attebury v. U.S.,* 430 F.2d 1162, 1163 n. 2 (5th Cir.1970)) (emphasis added). S-corporations, therefore, are treated for tax purposes in a manner similar to partnerships under Section 306 of the Code, which provides that the partnership shall not be subject to PIT, but PIT "shall be imposed on [the partner's] share, whether or not distributed, of the income or gain received by the partnership for its taxable year." Section 306 of the Code.

have no tax consequences for the taxpayer, for the repayment of the principal would be recovery of capital. If, however, the debtor's financial recovery and the resulting repayment took place after the close of the taxable year, the taxpayer would have a deduction for the apparently bad debt in the first year.... Without the tax benefit rule, the repayment in the second year, representing a return of capital, would not be taxable. The second transaction, then, although economically identical to the first, could, because of the differences in accounting, yield drastically different tax consequences. The Government, by allowing a deduction that it could not have known to be improper at the time, would be foreclosed from recouping any of the tax saved because of the improper deduction. Recognizing and seeking to avoid the possible distortions of income, the courts have long required the taxpayer to recognize the repayment in the second year as income.

*Hillsboro Nat'l Bank v. C.I.R.*, 460 U.S. 370, 377–79, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983) (emphasis added) (citations and footnotes omitted).

The example provided by the Supreme Court in *Hillsboro* quoted above is an example of the *inclusionary* aspect of the

rule. The *exclusionary* aspect of the rule, on which Marshall relies in this case, is codified in Section 111(a) of the IRC, 26 U.S.C. § 111(a), and provides:

> Gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year *to the extent such amount did not reduce the amount of tax imposed by this chapter.*

(Emphasis added). "The exclusionary aspect of the tax benefit rule ... qualifies the rule's inclusionary principle by excluding the recovery from income if, and to the extent that, the earlier deductions or credits were of no tax benefit." *Bittker, Boris I. Bittker & Stephen B. Kanner, Stephen B.,* The Tax Benefit Rule, 26 UCLA L.Rev. 265, 276 (1978–79). For example, a taxpayer, operating a business as a sole proprietor, in tax year 2000 has operating income of $75,000, from which he deducts $65,000 in miscellaneous operating expenses and $20,000 in bad debt expenses. This yields a net *loss* from operations of $10,000 and no PIT income for that year, illustrated as follows:

### *Table 4*

**Taxpayer's 2000 Net Operating Loss**

| | |
|---|---|
| **Gross Receipts from Operations** | $75,000 |
| LESS: | |
| Misc. Operating Expense Deduction | ($65,000) |
| Bad Debt Expense | ($20,000) |
| *Net Income (Loss) From Operations* | ($10,000) |

In 2001, however, the customer who failed to pay in the prior year pays the taxpayer the $20,000, which the taxpayer deducted as a bad debt expense in 2000. Thus, in 2001, the taxpayer *recovered* the amounts for which he took a prior year deduction from income. Without the tax benefit rule, the taxpayer would be required to include all of this recovery as income in 2001. The tax benefit rule, however, would allow him to exclude from income

the portion of the recovery for which he received no tax benefit. This amount would be determined by looking at what the taxpayer's 2000 tax obligation would have been had he *not* deducted the recovered amount:

*Table 5*

**Taxpayer's 2000 Net Operating Loss (without bad debt deduction)**

| | |
|---|---|
| **Gross Receipts from Operations** | $75,000 |
| LESS: | |
| Misc. Operating Expense Deduction | ($65,000) |
| *Net Income (Loss) From Operations* | $10,000 |

Thus, the deduction of the $20,000 bad debt expense only yielded a tax benefit to the taxpayer in 2000 of $10,000–*i.e.,* the amount necessary to reduce the taxpayer's income to $0.00. Accordingly, under the tax benefit rule, although the taxpayer recovered the full amount of the $20,000 debt in 2001, he can exclude $10,000 of that recovery (*i.e.,* the amount of the recovery for which taxpayer received no tax benefit in prior years) from 2001 taxable income.

For several reasons, we reject Marshall's effort to use the tax benefit rule to reduce the amount realized from the disposition of the Property and thereby reduce the PIT obligation of the Partnership (and by extension the partners) from that disposition. We first note that if we use the tax benefit rule in the way that Marshall asks, we would be acting contrary to Code and the Regulations. To be certain, the federal courts created the tax benefit rule to smooth out inequities in the IRC due to the annual reporting period. But it is not entirely clear to this Court that the tax benefit rule can or should be used by courts to directly overlook provisions of the IRC or, in this case, the Code and the Regulations. *See, e.g., Rosenberg v. C.I.R.,* 96 T.C. 451 (1991) (refusing to apply tax benefit rule where application of rule would result in deduction expressly prohibited by IRC). As noted above, and unlike the IRC, the Regulations prohibit offsetting of income and losses between classes of income. The Code prohibits NOL carryover deductions in computing PIT. Applying the tax benefit rule in the manner requested by Marshall in this case would allow both. We will not use the tax benefit rule in a way that abrogates provisions of the Code and/or the Regulations.

Second, the tax benefit rule is not a generic doctrine prescribed by the courts to remedy every apparent or perceived inequity or unfairness in an income tax system, state or federal. To the contrary, it was created to address a *specific and particular inequity* in the tax system caused by the annual accounting system for taxation. As the United States Supreme Court recognized:

> The *limited nature of the rule* and its effect on the annual accounting principle bears repetition: *only* if the occurrence of the event in the earlier year would have resulted in the disallowance of the deduction can the Commissioner require a compensating recognition of income when the event occurs in the later year.

*See Hillsboro Nat'l Bank,* 460 U.S. at 389, 103 S.Ct. 1134 (first emphasis added); *Am. Mut. Life Ins. Co.,* 46 Fed.Cl. at 451 ("The Tax Benefit Rule has been applied to a classic *but limited* set of tax items and transactions." (emphasis added.)). The rule is premised on the notion that like

transactions should have the same tax impact, whether they occur in a single year or over a span of two or more tax years—*i.e.*, transactional equity. The rule depends on a previously deducted expense that is "recovered" in a subsequent tax year. To constitute a "recovery" of a prior year deduction, the event in the current tax year must be "fundamentally inconsistent with the premise on which the deduction was initially based—[t]hat is, if that event had occurred within the same taxable year, it would have foreclosed the deduction," such that it warrants application of the tax benefit rule. *See Hillsboro Nat'l Bank*, 460 U.S. at 383–84, 103 S.Ct. 1134. The United States Court of Appeals for the Federal Circuit has held that taxpayers seeking to avail themselves of the exclusionary aspect of the tax benefit rule must establish three requirements: "First, there must be a loss that was deducted but did not result in a tax benefit. Second, there must be a *later recovery on the loss*. Third, there must be a *nexus between the loss and the recovery*." *John Hancock Financial Servs. v. U.S.*, 378 F.3d 1302, 1305 (Fed.Cir.2004) (citations omitted).

Here, Marshall fails to identify any transactional inequity to be remedied by the tax benefit rule in this case. Though the Partnership clearly deducted interest on the PMM Note over many years of operations, the subsequent disposition of the Property in 2005 was not inimical to those deductions. To the contrary, the Partnership, from its inception, contemplated the sale or disposition of the Property at the conclusion of the PMM Note term to pay off the balance of the PMM Note, which would include accrued and previously deducted interest. (Stip.¶¶ 32,

33.) Though the sale or disposition at issue here was a foreclosure, from a tax perspective it yielded the same result—*i.e.*, the Partnership was relieved of ownership of the Property and the full amount of the PMM Note obligation was satisfied.[32] Because the PMM Note was nonrecourse, from a tax perspective the foreclosure was the equivalent of a sale of the Property for the outstanding amount of the PMM Note obligation. In both cases, prior year interest deductions are not "recovered"; rather, they are expressly recognized and paid off—*i.e.*, satisfied. In the case of a third-party sale, they are paid off with the sale proceeds. In the case of foreclosure, they are paid off with the transfer of the Property to the lender.

Accordingly, there is no doubt that Marshall believes that the result in this case is unfair or inequitable. But his belief is not based on inequity or unfairness of the kind that the tax benefit rule was created to remedy. Marshall does not explain how the annual accounting period for PIT contributed to or caused the Partnership to incur a PIT obligation that it would not have incurred had the interest deductions and the foreclosure taken place in the same tax year. Moreover, as explained above, no prior year deductions of interest in the PMM Note were "recovered" by the foreclosure. The foreclosure, from a tax perspective, is treated the same as a sale of the Property to a third-party for the full amount of the PMM Note obligation due at foreclosure. In short, Marshall is in the same position he would have been had the Partnership sold the Property in 2005 for $2,628,497,551.

---

**32.** The Partnership also contemplated in the Offering Memorandum that in addition to paying off the full amount of the PMM Note, there would be additional proceeds from the sale to pass on to the partners as a return on investment. But that ideal scenario would have led to a greater PIT obligation than Marshall faces here, where the amount realized is only the amount of the PMM Note obligations satisfied through foreclosure.

Finally, Marshall does not cite to any precedent, state or federal, where a court has applied the tax benefit rule to reduce the amount realized on the sale or disposition of property. Indeed, by deciding in *Tufts* to characterize foreclosure of a property involving nonrecourse debt as a sale or disposition of property, rather than cancellation of a debt,[33] the United States Supreme Court may very well have foreclosed the use of the tax benefit rule to reduce the amount realized from such a transaction. *See Tufts,* 461 U.S. at 310 n. 8, 103 S.Ct. 1826 (noting that decision to include full amount of nonrecourse debt in amount realized "focuses on the obligation to repay and its subsequent extinguishment, not on the taking and recovery of deductions," distinguishing decision from prior analysis of Court that had "some affinity with the tax benefit rule"). This may explain why Marshall, relying on a rule that has been a staple of federal income tax law since the late 1920s,[34] has not cited to one case where the rule has been used in the way he seeks to use it here. The absence of any such authority bolsters our decision to reject Marshall's argument.[35]

---

**33.** *See Tufts,* 461 U.S. at 310 n. 11, 103 S.Ct. 1826 (rejecting as alternative capturing part of foreclosure transaction on nonrecourse debt as cancellation of debt, or ordinary income).

**34.** *See Bittker,* 26 UCLA L.Rev. at 266; *Am. Mut. Life Ins. Co. v. U.S.,* 46 Fed.Cl. 445, 451 (2000), *aff'd,* 267 F.3d 1344 (Fed.Cir.2001).

**35.** Because, for the reasons set forth above, this case does not present a circumstance for the proper application of the tax benefit rule, we need not decide the extent to which the rule can and should be applied when calculating Pennsylvania PIT. We note, however, that state courts which have applied the exclusionary component of the federal tax benefit rule, as codified in Section 111(a) of the IRC, for purposes of calculating the amount of state taxes due, have done so only after concluding that the relevant state tax law incorporated, either expressly or implicitly, federal tax law. Recently, the Court of Appeals of Michigan ruled that the federal tax benefit rule existed in Michigan because the Michigan Income Tax Act (ITA), MCL § 206.51(1), "expressly incorporates federal principles in calculating taxable income so that the terms in the ITA have the same meaning as when used in a comparable context in federal law." *Sturrus v. Dep't of Treasury,* 292 Mich.App. 639, 809 N.W.2d 208 (2011) (per curiam). The Supreme Judicial Court of Massachusetts and the Court of Appeals of Wisconsin relied on this same reasoning when they, too, recognized the ability of state taxpayers to invoke the federal tax benefit rule. *See Bill DeLuca Enters., Inc. v. Comm'r of Rev.,* 431 Mass. 314, 727 N.E.2d 508 (2000) (relying on express incorporation of federal tax laws in state tax law definition of "net income," Mass. Gen. Laws Ann. Ch. 63, § 30); *Schulz v. Wis. Dep't of Rev.,* 115 Wis.2d 542, 340 N.W.2d 563 (1983) (citing state tax law incorporation that defines state taxable income by reference to federal adjusted gross income as determined under IRC). The Appellate Court of Illinois, however, did not follow this approach. Instead, in *Rockwood Holding Company v. Department of Revenue,* the court held that notwithstanding the Illinois tax law's express incorporation of federal tax law definitions, *see* 35 Ill. Comp. Stat. 5/102, the federal tax benefit rule is a *substantive* provision of federal tax law, which Section 102 " 'does not, by itself, incorporate.' " 312 Ill.App.3d 1120, 1127, 245 Ill.Dec. 437, 728 N.E.2d 519, 526 (1st Dist.2000) (quoting *Bodine Elec. Co. v. Allphin,* 81 Ill.2d 502, 43 Ill.Dec. 695, 410 N.E.2d 828 (1980)). Similarly, in *Zalud Oldsmobile Pontiac, Inc. v. Tracy,* the Supreme Court of Ohio refused to apply the federal tax benefit rule, as codified in Section 111(a) of the IRC, because "Ohio's General Assembly has not enacted as similar statute." 77 Ohio St.3d 74, 80, 671 N.E.2d 32, 38 (1996) (per curiam). "We can enforce only those statutes that apply to Ohio's tax system." *Id.*

In Pennsylvania, however, neither the General Assembly, by legislation, nor Revenue, by regulation, has enacted a provision similar to Section 111(a) of the IRC. Moreover, unlike the state tax laws in Massachusetts, Michigan, Illinois, and Ohio, Section 301 of the Code does not define taxable "income" by express reference to the IRC. Finally, for reasons set forth above, there are some unique character-

We again note that our task here is not to find an alternative manner for Revenue to calculate PIT due on the foreclosure of the Property. Like Marshall, we can envision alternative ways for Revenue to apply the Code and Regulations to this particular transaction that could be characterized as more taxpayer-friendly. But that is not our role. Our role is to determine whether Revenue's treatment of the transaction comports with the Code and the Regulations, with deference to Revenue's reasonable interpretations of the same. Based on the foregoing, we cannot say that Revenue's interpretation and application of Pennsylvania law in this case was unreasonable. *See Dechert LLP*, 606 Pa. at 351, 998 A.2d at 586.[36]

### D. Disparate Treatment

■ Marshall argues that application of the PIT to him in this instance is unconstitutional, because it treats him differently from the partners who reside in Pennsylvania. Marshall contends that he cannot be liable for PIT in an amount greater than what a Pennsylvania resident partner would be liable to pay. Marshall contends that Revenue permitted resident partners in the Partnership to offset any taxable gain from the foreclosure of the Property with the loss incurred by the

partner upon liquidation of the Partnership. Revenue, however, denied nonresidents, including Marshall, the same offset. Thus, Marshall was assessed a tax over 11 times the tax imposed on a resident.

Marshall argues that such disparate treatment violates the United States Constitution, which prohibits states from imposing taxes in a manner that (i) burdens interstate commerce, or (ii) discriminates unfairly against out-of-state taxpayers. *See* U.S. Const. art. I, § 8, cl. 3; U.S. Const. art. IV, § 2. Disparate treatment also violates the Equal Protection and Uniformity Clauses of both the United States and Pennsylvania Constitutions. U.S. Const. amend. XIV, § 1; Pa. Const. art. V, § 2. Marshall contends that the foreclosure of the Property and the liquidation of the Partnership were parts of the same economic event occurring in Pennsylvania. The Partnership liquidated because the lender foreclosed upon the Property and the Partnership then had no business and no assets. As discussed above, Marshall contends that Pennsylvania law does not permit the subdividing of a tax base to produce a taxable income when a taxpayer actually suffers an overall economic loss. Because the Revenue's position is applied only to nonresidents, the result is discrimi-

---

istics of the Pennsylvania PIT that may be impediments to certain applications of the tax benefit rule. All of these factors, and perhaps others, will no doubt have to be considered if and when this Court is faced with an inequity in the Code or the Regulations of the type the tax benefit rule was created to remedy.

**36.** Like our Supreme Court in *Dechert LLP*, we are mindful of the rule of statutory construction which provides that statutory provisions imposing taxes are to be strictly construed. 1 Pa.C.S. § 1928(b)(3). But as the Supreme Court explained in *Dechert LLP*, "while 'any doubt or uncertainty as to the imposition of [a] tax must be resolved in favor of the taxpayer,' such doubt is only implicated after our efforts at statutory construction yield

no definitive conclusion." *Dechert LLP*, 606 Pa. at 348 n. 8, 998 A.2d at 584 n. 8 (quoting *Pa. Power & Light Co. v. Commonwealth, Bd. of Fin. and Rev.*, 553 Pa. 1, 7, 717 A.2d 504, 507 (1998)). Here, as explained above, we have concluded that Revenue's interpretation of the Code and Regulations in this case is reasonable in light of the language chosen by the General Assembly. By contrast, Marshall's competing interpretation lacks any support in state precedent interpreting the provisions or federal precedent interpreting analogous provisions in the IRC. Accordingly, like the Supreme Court did in *Dechert LLP*, we will uphold Revenue's reasonable interpretation.

natory. Finally, the Pennsylvania Constitution prohibits the Commonwealth from imposing unequal tax burdens on person who exercise the same privileges within the Commonwealth. Pa. Const. art. VIII, § 1.

Revenue defends its application of the PIT under these circumstances by noting that while operating income and expense of a partnership pass through to the partner as if he owned the assets and liabilities directly (in proportion to his partnership share), Section 306 of the Code, the purchase and sale of a partnership interest is a purchase and sale of an intangible asset. Because Marshall is a nonresident of the Commonwealth, his 2005 loss from the liquidation of his partnership interest is not income "from sources within the Commonwealth." *See* Section 302(b) of the Code. Intangibles cannot be sourced to the Commonwealth for nonresidents. *See Complete Auto Transit v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Pennsylvania Personal Income Tax Bulletin 2005–02, § 2 (*see* Revenue's Br., App. "A"), provides that gains and losses from the sale of a partnership interest are gains and losses from the sale of an intangible asset and must be sourced outside the Commonwealth for a nonresident.

Revenue further argues that Marshall's alleged Uniformity Clause violation is nothing more than a timing issue. If the Property had been foreclosed upon on December 30, 2005, and the Partnership liquidated in 2006, then the resident partners would *not* have been able to offset their real estate gains with their Partnership interest losses because they would have occurred in separate years.

Gains occasioned by the disposition of real property and gains occasioned by the disposition of intangible property, such as the disposition of an investment in a partnership, fall within the same class of income subject to taxation under Section 302 of the Code—namely, "[n]et gains or income from disposition of property." Section 303(a)(3) of the Code. Accordingly, a taxpayer may offset gains/losses from all such transactions in a single taxable year to arrive at the PIT due, if any. *See* 61 Pa.Code § 101.1. As noted above, however, the United States Constitution, specifically the Commerce Clause, limits the power of states to impose extra-territorial taxation.

■ We again note that Marshall bears a heavy burden on his constitutional challenge.[37] Marshall concedes "that losses incurred by a nonresident on the disposition of intangibles are not taken into account for PIT purposes." (Marshall's Reply Br. at 9.) Though Marshall would like us to create an exception to this rule, we refuse to do so. As discussed above, Pennsylvania simply lacks the authority, statutorily and constitutionally, to tax income of nonresidents from sources *outside of* the Commonwealth. It likewise cannot be compelled to take into account losses from sources outside of the Commonwealth when assessing PIT on nonresidents.

This conclusion, which necessarily flows from the *limited* powers of Pennsylvania to tax nonresidents, does not discriminate against nonresident taxpayers. Indeed, if Marshall had other Section 303(a)(3) losses from sources within the Commonwealth in 2005, he would have been permitted to offset those losses against any taxable gain attributed to the foreclosure of the Property, *notwithstanding his nonresident status*. He did not. Marshall's PIT obligation in 2005 is more reflective of his investment decisions and the constitutional limitations placed on Pennsylvania's ability

**37.** *See infra* n. 10.

to tax income of nonresidents from sources *outside* of the Commonwealth (*i.e.*, Marshall's partnership interest), than it is of Marshall's state of residence. We, therefore, reject his constitutional challenge of disparate treatment.

### III. CONCLUSION

For the reasons set forth above, we affirm in part the Board's determination in this case. As noted above, Revenue appropriately applied Pennsylvania law in assessing Marshall PIT for calendar year 2005 for his proportionate share of the Partnership's taxable gain as a result of the foreclosure of the Property. The amount assessed ($165,055.24), however, is either in error or, based on the record before us, cannot be verified. This is due to the lack of evidence available to the Court to determine the adjusted basis of the Property at the time of foreclosure. We thus vacate the Board's decision only as to the amount of PIT due and remand for a recalculation consistent with this opinion.

### ORDER

AND NOW, this 3rd day of January, 2012, the order of the Board of Finance and Revenue in the above-captioned matter, dated December 16, 2008, is AFFIRMED IN PART. The amount of tax assessed is VACATED and the matter is remanded to the Board of Finance and Revenue for a recalculation of the amount of tax due in conformity with the Court's opinion.

Unless exceptions are filed within 30 days pursuant to Pa. R.A.P. 1571(i), this order shall become final.

DISSENTING OPINION BY Judge McCULLOUGH.

This case is one of first impression and presents important issues concerning the consequences of a substantial write-off of nonrecourse financing under the Pennsylvania personal income tax (PIT) provisions of the Tax Reform Code of 1971 (Code), Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§ 7301–7361, or as constitutional issues of equal protection and uniformity vis-a-vis resident and non-resident taxpayers. While the Majority expended considerable effort in interpreting the tax implications of this case, I must dissent. I do not agree that the amount realized by this nonresident taxpayer for purposes of assessing the PIT from the foreclosure of what originally was a $308 million loan was his pro rata share of more than $2 billion, since that conclusion does not square with the plain meaning and strict construction of the PIT nor with the economic realities of this matter. I also do not believe that this case needs to be remanded since we sit *de novo* and can direct the parties to supplement the record to tie up any loose ends.

The parties, Petitioner Robert J. Marshall, Jr. (Marshall) and the Commonwealth of Pennsylvania (Commonwealth), Respondent, have stipulated to a series of facts that frame the issues before the Court and we summarize these facts below. 600 Grant Street Associates Limited Partnership (Partnership) purchased the property for $360 million, including $52 million in cash. (Joint Stipulation of Facts (Stipulation), No. 26.) The Partnership financed the remainder through a Purchase Money Mortgage Note (PMM Note) with an initial principal balance of $308 million, secured only by the subject property (Property). *Id.* Marshall later purchased a limited Partnership interest for $5,889 in cash and a promissory note in the amount of $143,000 that amounted to 0.151281% of the Partnership. (Stipulation, No. 13.) In 2005, the lender initiated

foreclosure proceedings on the property. (Stipulation No. 35.)

At that time, the outstanding balance on the PMM Note was approximately $2.6 billion, the bulk of which consisted of accrued but unpaid interest. (Stipulation, No. 37.) The Partnership utilized approximately $121.6 million of the accrued but unpaid interest to offset income from operations that otherwise would have been subject to PIT. (Stipulation, No. 38.) The Department of Revenue (Revenue) thereafter assessed Marshall, a resident of Texas, a PIT of $165,055.25, representing principal, interest and penalties for the 2005 tax year. (Stipulation, No. 1.)

It is without dispute that Marshall lost his entire investment, as did the other limited partners who invested in the Partnership, be they residents or nonresidents. Nonetheless, Revenue's PIT assessment, including penalty and interest, exceeds the amount of Marshall's investment. Revenue attempts to justify this apparently incongruous determination by claiming that the Partnership (not Marshall, who as a limited partner was insulated as a matter of law from Partnership liability) realized income in the nature of a discharge of indebtedness in the amount of the aforesaid $2.6 billion, although this was a nonrecourse obligation as to even the Partnership itself. Moreover, the original principal amount of the obligation ($308 million) is but a fraction of the total obligation, as unpaid interest was accrued, compounded, and added to the principal.

If Marshall's argument that because no cash or property was actually received by the Partnership as a result of the disposition of the property and, hence, there was no amount realized or gain is accepted, the Commonwealth claims that the PIT "has a huge hole built right into it" that would allow the use of "debt discharge," $2.6 billion in this instance, "to avoid the [PIT]." (Commonwealth's Brief at 10.)

Revenue has determined Marshall's distributive share of the discharged debt to be $3,976,417. The Commonwealth relies on *Commissioner of Internal Revenue v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), in support of its argument, and the Majority relies on this case as well in support of its decision. *Tufts* and its predecessor, *Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), established the notion that, for federal income tax purposes, the unamortized principal amount of a nonrecourse loan is to be included in the amount realized from a sale or disposition of the real estate.

The Majority proceeds to conclude that as a consequence of the foreclosure, there has been an "amount realized upon the disposition of the Property," and in reliance upon *Tufts*, the amount realized must at a minimum include the principal amount of the PMM note that the Partnership used to purchase the Property. The Majority also relies on a decision from the Eighth Circuit, *Allan v. Commissioner of Internal Revenue*, 856 F.2d 1169, 1173 (8th Cir.1988), holding that "the amount realized is the full amount of the nonrecourse liabilities which are discharged as a result of the transfer of the property," to support its conclusion that the accrued but unpaid interest on the PMM Note (approximately $2.3 billion) should be included in the amount realized as well as to support its remand to the Board of Finance and Revenue (Board) for the determination of the applicable adjusted basis.

Marshall also raises issues under the United States and Pennsylvania Constitutions related to his alleged disparate treatment as a non-resident taxpayer with respect to the treatment for PIT purposes of the loss realized from the dissolution of the Partnership subsequent to the foreclosure.

While the resident taxpayers have the benefit of using this loss to shelter a substantial portion of the gain attributed by the foreclosure, Marshall as a non-resident does not. Instead, this loss is out-sourced to his state of domicile, Texas. Nevertheless, the Majority rejects Marshall's constitutional claims.

I, disagree with the Majority's reasoning and conclusions for the reasons set forth below.

## I. THE PIT DOES NOT APPLY TO INCOME IN THE NATURE OF A DISCHARGE OF INDEBTEDNESS AND THE MAJORITY'S RELIANCE UPON *TUFTS* AND *ALLAN* IS INCORRECT.

### A. *The PIT does not apply to income in the nature of a discharge of indebtedness.*

The Majority takes great pains to analogize the PIT to the federal income tax in order to rationalize the foreclosure of the property as income. To do so, the Majority largely adopts the Commonwealth's argument that the foreclosure and subsequent discharge of indebtedness constitutes a taxable sale or disposition of property. This argument is based upon the premise that the PIT "must" apply to discharges of indebtedness; otherwise, the PIT "has a huge hole...." (Brief of Commonwealth at 10.) Initially, whether or not, as the Commonwealth contends, the PIT has a "huge hole" if taxpayers could use "debt discharge ... to avoid the [PIT]" is subject to debate and, in any event, the argument clearly suggests that it is the role of the judiciary in the first instance to correct legislative deficiencies only because of a perceived benefit to taxpayers.

The role of the judiciary is prescribed not only by 1 Pa.C.S. § 1921(b) (when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit), but also by 1 Pa.C.S. § 1928(b)(3) (provisions imposing taxes shall be strictly construed). Hence if there is a "hole" or other error in a statute, particularly one involving a statute concerning taxes, it is up to the General Assembly in the first instance to address the matter. *See Clifton v. Allegheny County,* 600 Pa. 662, 969 A.2d 1197 (2009) (Supreme Court, exercising judicial restraint, declined to invalidate the base year property tax assessment statutes noting that the General Assembly is the appropriate place in the first instance to fashion a more comprehensive and soundly constitutional scheme).

As the Majority notes, the PIT identifies eight separate classes of income subject to the PIT, all of which it must be noted are taxed at the same rate. Nowhere in any of the eight categories is the discharge of an indebtedness identified as income. Moreover, section 302 of the Code is clear that the PIT applies only to those eight income categories.

The federal income tax is clearly and notably different. Unlike section 302 of the Code, section 61(a) of the Internal Revenue Code (IRC), 26 U.S.C. § 61(a) defines "gross income" as "all income from whatever source derived" and specifically includes "[i]ncome from discharge of indebtedness" as gross income. *See* Section 61(a)(12) of the IRC, 26 U.S.C. § 61(a)(12). There is simply not a similar provision under the PIT provisions of the Code. Accordingly, taxation of the foreclosure of the property and subsequent discharge of indebtedness simply is not supportable. Our Rules of Statutory Construction oblige this Court to reach that very obvious conclusion. 1 Pa.C.S. § 1928(b)(3) (provisions of statute imposing taxes shall be strictly

construed). If this renders a "huge hole" in the PIT, then it is up to the General Assembly to plug it.[1]

## B. *The Majority's reliance upon Tufts and Allan is incorrect.*

Given that the PIT does not apply to income derived from a discharge of indebtedness, which is the central underpinning of Revenue's assessment of the PIT on Marshall, it cannot be seen how the Supreme Court's 1983 decision *Tufts* or the Eighth Circuit's 1988 decision in *Allan* support the Majority's conclusion that the amount realized from the foreclosure of the property exceeds $2.6 billion, of which more than $2 billion is, in reality, accrued and compounded interest.

It must be noted that *Tufts*, though a decision of the United States Supreme Court, dealt with a specific provision of the I.R.C., Section 1001 (26 U.S.C. § 1001), and not any provision of the PIT. The same is the case with *Allan*. Consequently, neither of these decisions is binding upon this Court as precedent and these decisions have utility only to the extent one wishes to use them as references. It is noteworthy that in her concurring opinion in *Tufts*, Justice Sandra Day O'Connor

expressed her preference for "quite a different" approach if the Supreme Court were "writing on a clean slate" except for the decision in *Crane*. *Tufts*, 461 U.S. at 317, 103 S.Ct. 1826. *Crane* is the problematic 1947 decision by the United States Supreme Court that is factually quite apart from the case before us.

The PIT does not contain any provisions akin to Section 1001 of the I.R.C. In determining the amount realized from the sale or disposition of property, Section 1001(b) includes "any money received plus the fair market value of the property (other than money received)". 26 U.S.C. § 1001(b). This phrase does not appear anywhere in the PIT. A similarly worded phrase does appear in section 103.13 of Revenue's regulations, 61 Pa.Code § 103.13. Upon this basis, the Majority bootstraps *Tufts* and *Allan* to adopt Revenue's interpretation that "other property" includes the total discharge of indebtedness resulting from the foreclosure of the Property. It is respectfully submitted that the analysis is incorrect, has no application to Marshall, and must be rejected.

First, nowhere in Revenue's regulations is the term "other property" defined. *Crane*, which spawned *Tufts* and *Allan*,

---

1. The Majority Opinion which, as noted above, largely adopts the Commonwealth's argument that the foreclosure of the Property and resultant discharge of indebtedness constitutes a taxable sale or other disposition of property, nonetheless seeks to isolate and differentiate the "discharge of indebtedness" from the "Sale or other disposition" that triggered it. I believe this is incorrect, however, for the only "income" that the Majority Opinion attributes to Marshall is that which was derived from the discharge of indebtedness that the Commonwealth posits resulted from the subject foreclosure, i.e., the "sale or other disposition" of Property. I respectfully submit that, since there is no cash or other boot that was derived from the foreclosure that the Majority Opinion attributes to Marshall, its attribution is either predicated upon the in-

correct notion (and the Commonwealth's argument) that the income realized from the sale or other disposition of the Property is the income derived from the discharge of indebtedness (which is not income under the PIT, *see* 1 Pa.C.S. §§ 1921(b)(3) and 1928(b)) or that there is no income at all. Moreover, the Majority Opinion buttresses the attribution of income to Marshall on the *Tufts* and *Allan* decisions, both of which dealt with the issue of whether there is income derived from a discharge of nonrecouse indebtedness resulting from a sale or other disposition of property. Neither case derived income from any source as a result of the sale or other disposition of property which was the subject of the respective cases. As will be disclosed *infra*, I believe the Majority Opinion's reliance on *Tufts* and *Allan* is also misplaced.

was decided 58 years prior to the subject foreclosure, *Tufts* was decided 25 years prior, and *Allan* 17 years prior. If Revenue believed this line of decisions defined "other property" in section 103.13 of its regulations, it had ample time to codify its position. Revenue should be bound by its protracted silence on the matter. *See* 1 Pa.C.S. § 1928(b)(3).

Second, neither *Tufts* nor *Allan* stand for the proposition that a discharge of nonrecourse indebtedness is "other property." Rather, those decisions categorized the nonrecourse indebtedness at issue as "true loans," i.e., the same as full recourse indebtedness, in order that the tax consequences of the transactions involved reflected the respective economic realities of each situation.

*Tufts* is factually distinct from the instant case, a point the Majority acknowledges to some extent. *Tufts* did not, as the Majority notes, address the issue of accrued interest rolled into principal. Instead, the taxpayers in *Tufts* were general partners who had the benefit of taking a substantial write-off against the basis in the subject property, a basis that was previously attributable to a nonrecourse loan. Nonetheless, the taxpayers were posturing to claim a tax loss due to the sale of the subject property to a third party who assumed the mortgage. There is absolutely no indication that the taxpayers in *Tufts* suffered any true or economic loss, whereas Marshall clearly has in the present case. Indeed, the Supreme Court noted in *Tufts* that to permit the taxpayer to claim a tax loss without any economic loss would be an "absurdity." *Tufts,* 461 U.S. at 312–313, 103 S.Ct. 1826. Accordingly, and under those circumstances, the nonrecourse loan in *Tufts* was determined to be a "true loan."

Nonetheless, reliance on *Tufts* still does not get the Majority where it needs to go to have more than $2 billion in accrued interest realized as gain. Instead, the Majority has to travel to Minnesota and the Eighth Circuit's decision in *Allan* to find support for this notion. Again, leaving the limited referential value of that case aside, its facts are clearly distinguishable.

In *Allan,* it was the taxpayers who sought the determination that interest paid to the Department of Housing and Urban Development (HUD) after it assumed the defaulted nonrecourse mortgage and made a part of principal could be used to inflate their basis in the Property. Ironically, the Commissioner of Internal Revenue argued against that position.

In determining that the property tax and interest payments made by HUD on behalf of the taxpayers (which it was obliged to do as the insurer of the defaulted mortgage) were includable as principal, the Eighth Circuit noted that HUD was in fact out of pocket monies, for it was paying the carrying costs of the mortgage for "legitimate business reasons," i.e., the hope that its loan would enable the taxpayers time to work out of its difficulties. *Allan,* 856 F.2d at 1173. Hence, the Court in *Allan* concluded that the HUD advances were part of a "true loan." *Id.*

In the case before us, however, Marshall derived no economic benefit from a basis inflated by the roll-up of accrued interest, and the assessment of tax by Revenue is for ordinary income under the PIT, not some relatively favorable capital gains treatment. Unlike *Allan,* the nonrecourse lender is not a government entity that actually expended public monies to acquire a defaulted mortgage and pay carrying costs.

Indeed, the exorbitant amount of interest that has accrued as to the subject nonrecourse loan raises the issue as to whether the same can realistically be

treated as a "true loan." It is not at all realistic that the Partnership, which consisted of only one property of declining value in a tough real estate market, could be expected to satisfy the $2.6 billion obligation attached to it. Clearly, as this tremendous debt continued to accrue at a compounding rate, there was little if any incentive to do anything other than default, and one cannot imagine a lender not realizing this.

Under the circumstances presented to the Court, it cannot be seen how the "relief" from this debt by virtue of foreclosure can be viewed as an economic benefit to Marshall since the only relief is abandonment of the property itself.[2] Hence, the nonrecourse loan in this instance is akin to preferred stock because the lender has taken on so much risk of nonpayment due to the speculative nature of recovery of the principal and accrued and compounded interest thereon. To that end, there is extensive case law history of the IRS refusing to accept the form of so-called debt instruments as controlling and treating them instead as stock because of the speculative nature of recovery. *See* Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, Section 4.05 (1979); *see also Tufts*, 461 U.S. at 307, n. 5, 103 S.Ct. 1826 ("The Commissioner might have adopted the theory, implicit in Crane's contentions, that a nonrecourse mortgage is not true debt, but instead a form of joint investment by the mortgagor and mortgagee ...").

## II. THE TAX BENEFIT RULE SHOULD BE APPLIED SO AS TO RECOGNIZE ECONOMIC REALITY.

In light of the foregoing considerations, the Court should evaluate the economic reality of this case. Marshall clearly lost his entire investment and he clearly did not realize an economic benefit anywhere near the more than $3 million Revenue attributes to him for PIT assessment purposes. He did, however, realize a benefit to the extent he was able to shelter income imputed to him, i.e., his fractional share of $121.6 million. Marshall clearly had a tax and economic benefit to that extent.

Application of the tax benefit rule should be applied so as to recapture Marshall's otherwise sheltered income.[3] While the tax benefit rule is not codified in Pennsylvania, it is clearly recognized by Revenue given the references to the rule and the discussion of its application in its PIT Guide, which in turn is published on the Department's website and includes detailed instructions regarding, *inter alia,* pass through entities such as partnerships and the treatment of partnership losses. While the PIT Guide is not a statute or regulation and, hence, does not have the force of law, the PIT Guide was prepared

---

**2.** As Professor Boris I. Bittker so aptly stated:

Relief from a nonrecourse loan is not an economic benefit if it can be obtained only by giving up the mortgaged property. It is analogous to the relief one obtains from local real property taxes by disposing of the property. Like nonrecourse debt, the taxes must be paid to retain the property; but no one would suggest that the disposition of unprofitable property produces economic benefit equal to the present value of the taxes not paid in the future.

Bittker, "Tax Shelters, Nonrecourse Debt, and the Crane Case", 33 Tax L.Rev. 277, 282 (1978).

**3.** If the subject nonrecourse debt is not a "true loan," it would be equity akin to preferred stock inasmuch as the holder would have a preference as to the disposition of the property, which is the case here. Consequently, the "interest" payments to the lender would be treated for tax purposes as nondeductible dividends that would not shelter the aforementioned $121.6 million of Partnership income.

by Revenue and, as the Majority states, sets forth a statement of policy which includes application of the tax benefit rule.[4]

Herein, the parties stipulated that the Partnership only used $121.6 million of accrued but unpaid interest to offset income from operations that otherwise would have been subject to PIT. (Stipulation, No. 38.) Application of Partnership interest in said $121.6 million, or $183,958 ($121.6 million × 0.151281%), would subject Marshall to PIT in the amount of $5,648 ($183,958 × 3.07%).[5]

## III. MARSHALL RAISES A LEGITIMATE CONSTITUTIONAL CLAIM.

Finally, Marshall raises legitimate constitutional concerns at least as to the Uniformity Clause of the Pennsylvania Constitution which provides that all taxes shall be uniform upon the same class of subjects. Pa. Const. art. VIII, § 1. In this case, the Department permitted Pennsylvania resident limited partners in the Partnership to offset any taxable gain from the foreclosure of the property with the loss incurred upon liquidation of the Partnership. Nonresidents such as Marshall were denied this offset, even though the foreclosure of the property and the liquidation of the Partnership were parts of the same economic event occurring in this Commonwealth.

A resident and nonresident partner in the Partnership each exercised the same privilege in Pennsylvania by investing in the Partnership, and, hence, the tax burden placed on the nonresident partner should not exceed the burden placed on the resident partner. Indeed, our Pennsylvania Supreme Court has indicated that the Uniformity Clause of the Pennsylvania Constitution requires that a tax be applied with substantial equality of the tax burden to all members of the same class. *Amidon v. Kane*, 444 Pa. 38, 279 A.2d 53 (1971). In *Amidon*, the Court held that the Uniformity Clause was violated where taxpayers enjoying the same privilege of receiving, earning or otherwise acquiring the same amount of income as others were required to pay a larger dollar amount of taxes.

The Majority's counter to Marshall's constitutional claims is to rely upon Pennsylvania Personal Income Tax Bulletin 2005–02, Section 2.[6] However, the Bulletin's provisions contradict the Majority's assertion that the loss occasioned by the dissolution of this limited Partnership must be sourced outside the Commonwealth for a nonresident limited partner because (a) the Bulletin only speaks of gains, not losses, and (b) the Bulletin applies only to going concerns. As to (a), the dissolution that occasioned the loss in this instance is not even mentioned in the Bulletin, so clearly the Bulletin does not provide a basis for the outsourcing of the subject loss. With respect to (b), the Partnership clearly was not a "going concern" at the time of dissolution. The Partnership's only source of income and business activity was the property, which had been previously foreclosed upon. Hence, the

---

4. The application of the tax benefit rule to reflect the economic reality of a taxable event is a substance over form approach, which is supported by this Court's decision in *Commonwealth v. Rigling*, 48 Pa.Cmwlth. 303, 409 A.2d 936 (Pa.Cmwlth.1980), wherein we held that the basis provisions of the PIT could not be applied to impose a tax when there is in fact no income.

5. As the Majority notes, Marshall had no other Pennsylvania sources of income or loss.

6. A copy of this Bulletin is attached as Appendix A to the Commonwealth's brief.

Partnership was an idle and empty shell by the time it was dissolved.

Consequently, Marshall should be given the same benefit as resident limited partners and be permitted to offset his pro rata share of the dissolution loss against income. I also do not believe that it is necessary to remand this matter to the Board for this determination. Since this Court sits in review *de novo*, the parties should be directed to supplement the record so that the amount of loss attributed to Marshall may be identified and applied to his tax benefit.

For these reasons, I respectfully dissent from the Majority's decision.

Judge SIMPSON joins in this dissenting opinion.